AGNEW et al. v. BOARD OF GOVERNORS
OF FEDERAL RESERVE SYSTEM
et al.

No. 9102.

United States Court of Appeals
District of Columbia.

Argued Nov. 14, 1945.

Decided Feb. 13, 1946.
Writ of Certiorari Granted April 29, 1946.
See 66 S.Ct. 979.

Mr. Hugh H. Obear, of Washington, D. C., for appellants.

Mr. J. Leonard Townsend, Assistant General Attorney, Board of Governors of the Federal Reserve System, of Washington, D. C., with whom Mr. Edward M. Curran, United States Attorney, of Washington, D. C., was on the brief, for appellees.

Before EDGERTON, WILBUR K. MILLER, and PRETTYMAN, Associate Justices.

PRETTYMAN, Associate Justice.

Appellants sought from the District Court a writ of certiorari to the Board of Governors of the Federal Reserve System (to which we shall refer as the Board) or, in the alternative, a mandatory injunction, seeking review of an order of the Board which had removed them from office as directors of the Paterson National Bank of Paterson, New Jersey. The District Court dismissed the complaint.

The substantive controversy revolves around the meaning of the words "primarily engaged" in the following statute:

"No officer, director, or employee of any corporation or unincorporated association, no partner or employee of any partnership, and no individual, primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities, shall serve the same time as an officer, director, or employee of any member bank except in limited classes of cases in which the Board of Governors of the Federal Reserve System may allow such service by general regulations when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments." [1]

The Board is empowered,[2] upon certification by the Comptroller of the Curren-

EDGERTON, Associate Justice, dissenting.

---

[1] Act of June 16, 1933, c. 89, § 32, 48 Stat. 194, as amended Aug. 23, 1935, c. 614, § 307, 49 Stat. 709, 12 U.S.C.A. § 78.

[2] By Section 30 of the Act, 12 U.S.C.A. § 77.

cy, to remove from office a director of a member bank if it finds that he has continued to "violate any law" relating to the bank, after having been warned by the Comptroller. A director who participates in the management of a bank after having thus been ordered removed from office, is liable to a fine of not more than $5,000 or imprisonment for not more than five years, or both.

Appellants were directors of the Paterson National Bank, one since November 27, 1934, and the other since January 13, 1925. Since March, 1941, they have been employees of Eastman, Dillon & Co., a New York concern engaged in the securities business.

After certification by the Comptroller of the Currency and after hearing, the Board made the following findings of fact in respect to Eastman, Dillon & Co.:

The company advertises its business as "Underwriters, Distributors, Dealers and Brokers in Industrial, Railroad, Public Utility and Municipal Securities." For the fiscal year 1943, its gross income from the "underwriting field" (meaning the issue, flotation, underwriting, public sale or distribution, at wholesale or retail or through syndicate participation, of stocks, bonds or other similar securities) [3] amounted to 26 per cent of its gross income from all sources; and its gross income from the brokerage business (acting as agent in buying and selling for others) amounted to 42 per cent of its gross income from all sources. For the fiscal year ending February 29, 1944, its gross income from the "underwriting field" amounted to 32 per cent of its gross income from all sources; and its gross income from the brokerage business amounted to 47 per cent of its gross income from all sources. Considering the market value of the securities which were bought and sold by the firm as agent as well as those bought and sold by it for its own account during an indefinite period prior to September 20, 1943, that part lying within the "underwriting field" would represent about 15 per cent of the total market value. If one were to classify the total number of transactions during an indefinite period prior to September 20, 1943, it would be found that those in the "underwriting field" would amount to a similar percentage (15 per cent) of the total number. During the year 1943, the firm ranked ninth among 94 leading investment bankers of the country with respect to its total participations in underwritings of bonds. Excluding municipal and railroad bonds, its participations in underwritings during 1943 amounted to $14,657,000. For a period during 1943 it ranked first among the underwriters.

Upon the basis of the foregoing findings of fact, the Board reached the following "Conclusions of Law":

"The only substantial question, and the one upon which this matter turns, is whether Eastman, Dillon & Co. was, at the times stated in the certificate of the Comptroller of the Currency, 'primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities' within the meaning of section 32 of the Act. The Respondents contend that the use of the word 'primarily' limits the application of the statute to those cases in which the underwriting business of the securities firm is first in volume in comparison with any other business or businesses in which it engages. It is true that, under one of its definitions, the word has a quantitative meaning. This, however, is not the only accepted meaning. The word 'primary' is frequently used in another sense. For instance, red is one of the 'primary' colors but it is not the only primary color; Saturn is one of the 'primary' planets but it is neither the only nor the largest one. Standard dictionaries cite as examples of the use of the word in the latter sense expressions such as 'the primary causes of a war' and 'a matter of primary importance.' (Merriam-Webster International Dictionary and Webster's Collegiate Dictionary) The Board is mindful of the rules of statutory construction that, while all of the words of a statute should be considered as having meaning, where a word used in a statute is susceptible of several meanings, that meaning should be adopted which best accords with the intention of the legislature in enacting the statute. Also, a word used in a statute should not be construed to produce an absurd consequence if it is susceptible of another construction in accord with the legislative intent. Section 32 is one of several measures enacted in 1933 designed to di-

---

[3] The Board thus used the term "underwriting" to mean the entire operation described in the statute. We shall so use it.

vorce commercial banking from investment banking. To say that a securities firm ranking ninth among the leading investment bankers of the country with respect to its total participations in underwritings ·of bonds, and for a period ranking first, should be held to be beyond the scope of the statute is to say that Congress enacted a statute with the intention that it would apply to no one. The construction for which the Respondents contend, which is based on one accepted definition of the word 'primarily', would lead to that result. The other construction, which is based on another accepted definition of that word,· 'would conform to the Congressional intention as established by the legislative his- .tory. Accordingly, the Board finds as a matter of law that Eastman, Dillon & Co., at the times stated, was 'primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities.'"

In general terms the questions presented are: Had the District Court jurisdiction? If so, what power has the court? Should the Board's interpretation of the statute stand?

It is important that the first two questions be more precisely defined. Generalities as to judicial review serve to confuse rather than to clarify. Three features of the case at bar delimit its questions of jurisdiction and of power. First, the statute involved is a general prohibition directed to all persons whatsoever. It forbids the persons described from being directors of a member bank. The authority of the Board is statutory and extends as far as, but no further than, the acts prohibited by the statute itself. Second, the Board seeks to determine the meaning of the statute as a matter of law; it does not present as the determinative premise. of its order a finding of fact that Eastman, Dillon & Co. was primarily engaged in underwriting. It is quite clear and commendably candid about its action and its objective. The facts as to Eastman, Dillon & Co. are the material from which the ruling is fashioned, but the ruling itself is a statutory construction. Third, no statutory method of appeal exists

and the persons involved must, in order to test their rights, either seek the process of injunction or submit to criminal prosecution. The order of the Board is a final order.

The question of jurisdiction, therefore, is: Where an administrative agency issues a final order affecting the rights of individuals, which order is based upon a construction of a statute of general application, upon which construction the authority of the agency depends, and where, there being no statutory appeal, the individuals involved have no means of testing their rights except by civil action for injunction or by subjecting themselves to criminal liability by disobeying the order, has a Federal District Court jurisdiction to examine the order of the agency in a civil action for injunction? We think that it has.

We are not at this point considering the range of issues open to review, but merely whether, under the circumstances stated, resort can be had to the court at all. It is the right to challenge, not the extent of the remedial power, which must first be considered. We think it unnecessary to analyze the long line of cases dealing with the subject. Concurring in the St. Joseph Stock Yards case,[4] Mr. Justice Brandeis remarked, "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied." The factors determinative of jurisdiction vel non were carefully analyzed by Mr. Justice Frankfurter in the Rochester Telephone case.[5] The Duquesne Warehouse cases in this court[6] and in the Second Circuit[7] contain elaborate references to the authorities. In his dissent in the latter case, Judge Frank commented:

"I note in passing that in this Circuit we have not believed that the Supreme Court has suggested that we submit to 'administrative absolutism,' and consequently we have not hesitated to protect the legal rights of citizens when administrative officers have acted in excess of their statutory powers."

We think it unnecessary to review the cases at length.

4 St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 84, 56 S. Ct. 720, 740, 80 L.Ed. 1033.

5 Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 59 S.Ct. 754, 83 L. Ed. 1147. ,

6 Railroad Retirement Board v. Duquesne Warehouse Co., 1945, 80 U.S.App.D.C. 119, 149 F.2d 507.

7 Duquesne Warehouse Co. v. Railroad Retirement Board, 2 Cir., 1945, 148 F.2d 473, 485.

■ The pending dispute is obviously a controversy and a case. The order complained of is not an interim administrative step. The requirements of equity are met by the fact that "disregard of the Commission's adverse action entails threat of oppressive penalties." [8] The challenged power of the Board arises only when a director of a bank continues to violate a "law", in this case a statute. The content of the "law" is a subject for judicial determination. When presented under circumstances such as those just outlined, equity power exists to consider it.

A more difficult problem is the scope of the power of the court having jurisdiction. This question, like the question of jurisdiction, must be stated in terms of the case at bar, and not as an abstract generality. Most important of the limiting circumstances in this respect is that the Board has rested its order upon a construction of the statute as a matter of law. It did not evade or becloud the issue by merely making a finding of fact that, considering all the facts and circumstances, Eastman, Dillon & Co. was primarily engaged in underwriting, thus seeking the protection of the doctrine of substantial evidence. Its objective is not the treatment of this concern alone. It seeks, quite properly, to establish the meaning of the statute which gives it power. With frankness and candor, which we think admirable, it poses the precise question to which it seeks an answer. Its course was to conclude that,

as a matter of law, the phrase "primarily engaged" encompasses activities which, while not first or principal, are nevertheless substantial and important; and it then found that, within the meaning thus established, Eastman, Dillon & Co. was primarily engaged in underwriting.

■ The ultimate question before us is whether the interpretation of the statute by the Board, as the definition of a standard to be applied generally, is correct. That question is not one of fact. It is not even what one learned author calls "a particularized conclusion," [9] i. e., the exercise of judgment with respect to particular facts in determining the application of the statute.[10] The question is a matter of law.[11] We need not, therefore, attempt to thread our way through the confused and conflicting phases of the subject of judicial review which have puzzled both courts and students. On matters of law, unmixed, reviewing courts are free to substitute their own judgment for that of the administrator, although great weight must be given the administrative judgment. Consideration of a few recent decisions of the Supreme Court are sufficient to establish this conclusion. Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; [12] Security Mills Co. v. Com'r, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Medo Photo Supply Corp. v. Labor Board, 1944, 321 U.S. 678, 681, 682, note 1, 64 S.Ct. 830, 88 L.Ed. 1007.[13] For an earlier statement see Great Northern Rail-

[8] Language of Mr. Justice Frankfurter in the Rochester Telephone case, supra [307 U.S. 125, 59 S.Ct. 758] note 5.

[9] Stern, Review of Findings of Administrators, Judges and Juries, 58 Harv.L. Rev. 70, 98.

[10] National Labor Relations Board v. Hearst Publications, 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; South Chicago Coal & Dock Co. v. Bassett, 1940, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732; Parker v. Motor Boat Sales, 1941, 314 U. S. 244, 62 S.Ct. 221, 86 L.Ed. 184; Rochester Tel. Corp. v. U. S., supra note 5.

[11] "When the issue relates to the existence or nature of a general rule or standard which will be applicable to many cases, it is normally regarded as presenting a question of law." Stern, supra note 9, at 94.

[12] "It is contended that the applicable statutes and regulations properly interpreted forbid the method of calculation followed by the Tax Court. If this were true, the Tax Court's decision would not

be 'in accordance with law' and the Court would be empowered to modify or reverse it. Whether it is true is a clear-cut question of law and is for decision by the courts." (Page 492 of 320 U.S., page 242 of 64 S.Ct., 88 L.Ed. 248.) " * * * ; when the court cannot separate the elements of a decision so as to identify a clear-cut mistake of law, the decision of the Tax Court must stand. In view of the division of functions between the Tax Court and reviewing courts it is of course the duty of the Tax Court to distinguish with clarity between what it finds as fact and what conclusion it reaches on the law. In deciding law questions courts may properly attach weight to the decision of points of law by an administrative body having special competence to deal with the subject matter." Id., at page 502 of 320 U.S., at page 247 of 64 S.Ct., 88 L.Ed. 248.

[13] See also Stern, supra note 9, at 97: "Such questions as to the test to be applied or the factors to be considered relevant or controlling are legal rather than

way Co. v. Merchants' Elevator Co., 1922, 259 U.S. 285, 295 et seq., 42 S.Ct. 477, 66 L.Ed. 943.

We conclude as to the scope of the power of the court that the construction of the statute, for violation of which the Board is authorized to remove from office directors of a bank, is essentially a judicial function, but that the construction given the statute by the Board is entitled to great weight and respect.

The Board, in contending that the interpretation of this statute is within its unreviewable authority, relies upon Adams v. Nagle, 1938, 303 U.S. 532, 58 S.Ct. 687, 82 L.Ed. 999, as controlling. We find little similarity between that case and the case at bar. The opinion in that case, by Mr. Justice Roberts, dealt with the power of the Comptroller of the Currency to determine the sufficiency of the assets of a closed national bank as a prerequisite to assessment against the stockholders. The Court found that it had been invariable administrative practice, apparently since 1864, for the Comptroller to make such determinations, that prompt liquidation of such banks was desirable, that it would be intolerable if the Comptroller's decisions were open to attack collaterally, and that Congress had confided this function to the Comptroller. The Court held that the primary object of the statute was the protection of creditors, that reimbursement of the stockholders must await possible realization upon the assets, and that the remedy of the stockholder must await that event. None of these circumstances or considerations are in the present case.

We come now to consider the meaning of the statute. The facts in the case at bar are clear and clearly found. Thereby the alternative involved in the decision is made clear. Underwriting and brokerage, although both concerned with securities, are vastly different operations. By no quantitative test shown in this record can Eastman, Dillon & Co. be held to be principally or chiefly engaged in underwriting. Whether measured by volume, by income, or by number of transactions, its business is principally brokerage.[14] On the other hand, its underwriting business is substantial, and it ranks high in the relative dollar amount of such business among concerns in the United States. So, if substantial business other than the chief or principal business be considered, the company is within the statute. Thus, the question narrows to this: Does "primarily engaged" mean chiefly, or principally, engaged, or does it mean simply substantially, or importantly, engaged?

The Board says that the phrase "primarily engaged" has two possible meanings. Its premise is that the word "primary" has two possible meanings, one being a quantitative meaning and the other the meaning which the word has in expressions such as "the primary colors," "one of the primary planets," "the primary causes of war," and "a matter of primary importance." It says that the latter meaning accords with the legislative intent and, further, that the former leads to absurd results. It, therefore, adopts the latter meaning and concludes that, as a matter of law, Eastman, Dillon & Co. was primarily engaged in underwriting within the meaning of the statute.

It is true that the adjective "primary" has different shades of meaning, but always its basic idea is "first". It may refer to the first in order of time, and thus mean original or initial; or in order of importance, and thus mean chief or principal; or in order of derivation, and thus mean fundamental. Its synonyms are "prime" and "primeval". Its antonyms are "secondary" and "lesser". The difference which the Board senses, but does not state, is that "primary" is not restricted to the singular; it may refer to a plural. Thus, the primary colors are not one but several; and so with the planets and the causes of war. An activity may be either *a* primary activity or *the* primary activity of a given person. The adverb "primarily" has similar shades of meaning. The Board's

---

factual. Though they must be determined initially by the lower court or administrative body, it is open to the reviewing court to set them aside whenever it disagrees with the decision below."

[14] These are all the quantitative measures mentioned or found by the Board, and the court is not permitted to speculate as to whether other measurements, such as net income, interest, effort or self-appraisal of importance, not found by the Board, might lead to a different result. We must assume that the Board mentioned all relevant factors, and certainly the validity of its conclusions must rest upon its findings and not upon speculations by the court as to other facts.

interpretation is, in effect, that "primarily engaged" as it occurs in this statute encompasses all the important activities of a concern; that it means "a" primary activity, not merely "the" primary activity.

But "primary" when applied to a single subject always means first, or chief, or principal. A concern's "primary activity" is never one of several; it is always the first, or chief, or principal, activity. And so it is with "primarily". When applied to a single activity, as it is to underwriting in the case at bar, it always means the first, or chief, or principal, activity. One would never say that a person is "primarily concerned" or "primarily interested" or "primarily engaged" in a specified single activity, if the idea sought to be conveyed was that the named activity was a lesser among several important activities. To say that such an expression conveys that idea is, we think, clearly erroneous.

In its brief, the Board epitomizes its position by saying, "Undoubtedly, then, Eastman, Dillon & Co. are 'fundamentally' or 'primarily' engaged in both the brokerage business and the underwriting business. To put it otherwise, underwriting is one of the businesses in which the firm is 'primarily' engaged." The latter sentence makes plain the error of law of the Board. It is true that the word "primary" may be applied to a plurality of items in order to distinguish that group from still others as secondary. But this does not answer the question which is posed by the statute. That problem is to ascertain whether the designated concern is primarily engaged in a single, named activity, i. e., underwriting. That problem is not solved by finding that the concern is primarily engaged in a group of several activities, in contradistinction to still other lesser activities, and then concluding that the concern is primarily engaged in each separate activity in the first group. That process would lead to the conclusion that an activity which, standing by itself, is by every standard less than another, is, nevertheless, primary.

Such a conclusion is simply not true. The activity in which the concern is in fact secondarily engaged cannot be made its primary engagement by a process of reasoning which includes a fallacy of division.

The expression which Congress chose to use in this statute is an ordinary one, and in ordinary usage certainly refers to the chief or principal activity in which the company is engaged.[15] In dealing with practical matters, Congress does not consciously utilize obscure meanings of ordinary words to convey its intent. We should not impute to it either an ineptitude or a departure from its custom. So far as the ordinary and normal meaning of the words is concerned, the matter before us is clear and without difficulty. The sum of the matter is that we simply do not see how it can be said that a company is *primarily* engaged in underwriting, when underwriting is not, by any standard of measurement shown by the record, its chief or principal business. The Board strains at the language in order to achieve a result which it believes to be desirable.

It should be added that if Congress had meant to direct its prohibition to companies simply engaged in underwriting, or substantially engaged in underwriting (i. e., to companies whose underwriting activities are secondary although important among several activities), it could have said so, as it has said many times in statutory enactments, and did in fact, as we shall see, so say in another section of this same Act.

But the Board says, quite properly, that legislative intent must govern statutory construction. It says that Congress intended to separate as far as possible national and member banks from securities dealers. In support, it points in its brief to the Senate Committee Report[16] on the bill which became the Act, and to Section 20[17] and Section 21[18] of the Act.

The section of the Committee Report upon which the Board relies reads:

---

[15] It is true, as the Board says in its brief, that some dictionaries give "fundamental" as a meaning of "primary"; and some also give "essential", which, however, the Board does not mention. But these words are not synonyms of "primary", and they overlap in meaning only when the implication of "fundamental" or "essential" is "first" or "principal". Other meanings of "fundamental" and "es-

sential" cannot be ascribed to "primary" merely because the words are in part analogous. Certainly those words, in meanings other than "principal", are not apt as descriptive of business activity.

[16] Sen.Rep.No.77, 73rd Cong., 1st Sess. (1933).

[17] 48 Stat. 188, 12 U.S.C.A. § 377.

[18] 48 Stat. 189, 12 U.S.C.A. § 378.

"The committee has, therefore, determined to present proposed legislation aimed at the following objects:

"(1) To separate as far as possible national and member banks from affiliates of all kinds."

But the bill upon which the Committee was reporting contained a definition of "affiliates". When the Committee said affiliates", it was using a term defined, not a generality. The bill, and the consequent Act [19] defined an affiliate as any corporation, etc., of which a member bank owns or controls either a majority of the voting shares or more than 50 per cent of the shares voted for the election of directors, or controls in any manner the election of a majority of directors; or of which control is held by shareholders of a member bank who own or control either a majority of the shares of the bank or more than 50 per cent of the shares voted for the election of directors of the bank; or of which a majority of its directors are directors of any one member bank. It is thus clear that the separation about which the Senate Committee was speaking in the Report relied on by the Board, was based upon a majority of shares or a majority of directors. It was not a complete dissolution of intermingled personnel; it was a dissolution of control only. It applied a quantitative test. Such were the "affiliates" to which the Senate Committee referred.

Moreover, the full text of the Committee Report does not bear out the meaning attached by the Board to the single sentence quoted. The context is:

"(a) The greatest of such dangers is seen in the growth of 'bank affiliates' which devote themselves in many cases to perilous underwriting operations, stock specula-tion, and maintaining a market for the banks' own stock often largely with the resources of the parent bank. This situation was never contemplated by the National Banking Act, and it would, therefore, appear that the affiliate system calls for the establishment of some legislative provisions designed to deal with the situation. It has been suggested from many quarters that the affiliate system be simply, 'abolished.' This suggestion has much authority behind it, but, in addition to the manifest difficulty of enforcement, owing to the existence of well-known subterfuges to maintain control, there remains the question whether it would be of much real service so long as State legislation permits the growth of affiliates in connection with State banks and trust companies. The committee has, therefore, determined to present proposed legislation aimed at the following objects:

"(1) To separate as far as possible national and member banks from affiliates of all kinds.

"(2) To limit the amount of advances or loans which can be obtained by affiliates from the parent institutions with which they are connected.

"(3) To install a satisfactory examination of affiliates, working simultaneously with the present system of examination applicable to the parent banks." [20]

It is thus clear that the Committee, in this section of its Report, was concerned with the "bank affiliate" system, and, further, that it did not deem feasible the abolition of that system, dangerous though it was said to be. That the legislation was not designed to accomplish the total abolition of even the affiliate system, and was addressed to a described evil, lends weight

---

[19] 48 Stat. 162, 12 U.S.C.A. § 221a. The Act said:

"As used in this chapter—

\* \* \* \* \* \*

"(b) Except where otherwise specifically provided, the term 'affiliate' shall include any corporation, business trust, association, or other similar organization—

"(1) Of which a member bank, directly or indirectly, owns or controls either a majority of the voting shares or more than 50 per centum of the number of shares voted for the election of its directors, trustees, or other persons exercising similar functions at the preceding election, or controls in any manner the election of a majority of its direc-tors, trustees, or other persons exercising similar functions; or

"(2) Of which control is held, directly or indirectly, through stock ownership or in any other manner, by the shareholders of a member bank who own or control either a majority of the shares of such bank or more than 50 per centum of the number of shares voted for the election of directors of such bank at the preceding election, or by trustees for the benefit of the shareholders of any such bank; or

"(3) Of which a majority of its directors, trustees, or other persons exercising similar functions are directors of any one member bank."

[20] Supra note 16, at 10.

to the idea that in using the word "primarily" in its description of the prohibited relationship in Section 32 of the Act, Congress intended a restricted scope rather than totality in the prescribed separation.

Referring to Section 20 of the Act, the Board says, in its brief in this court: "One of the principal sections designed to attain these purposes is section 20 of the Act, which provides that no member bank shall be affiliated 'in any manner' with any company 'engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities.'"

██ But the Act does not read as the Board quotes it. It does not say "that no member bank shall be affiliated 'in any manner' with any company," etc. It says, "no member bank shall be affiliated in any manner *described in subsection (b) of section 221a of this title* with any corporation," etc. (Italics supplied.) The subsection mentioned is the definition of affiliates which we have just discussed. Thus, Section 20, in full text, prescribes dissolution of control only, and not the complete divorcement indicated by the partial quotation relied on by the Board. There is a vast difference.

Thus, it is plain that the Committee Report and the section of the Act from which the Board says we must derive the intent of Congress, do not prescribe the complete divorcement which the Board urges, but, quite the contrary, direct only a dissolution of control. In each provision of the definition of the prohibited affiliation, the line is drawn at the majority. Forty-nine per cent is permissible. Fifty-one percent is prohibited. This is a quantitative test. If, as the Board says, we are to ascertain the intent of Congress by these references, we reach the clear conclusion that Congress intended to apply a quantitative test in its prohibition.

As to Section 21 of the Act, the Board says, in its brief in this court: "Section 21 is complementary to section 20 and, among other things, prohibits any company which is engaged in the underwriting business from engaging 'at the same time to any ex-

tent whatever in the business of receiving deposits * * *.'"

This section of the Act, prohibiting dealers in securities from engaging in the banking business, contains two expressions pertinent to the present inquiry. Congress here used the phrase "engaged in the business"—not "primarily engaged," or "principally engaged," but simply "engaged". It added the emphatic phrase "to any extent whatever". These words prescribe complete separation. When Congress meant complete separation, it said so, in this same Act, in unmistakable terms. It knew what terms to use, and used them.

██ We do not know why Congress, in separating member banks from outside interests, went only so far as to prohibit control. We do not know why it rested its prohibition upon the precise line of majority. We only know that it did so. And the fact that it did so seems to indicate that when it used the term "primarily engaged" in Section 32 of the Act, as contrasted with "engaged" and "engage at the same time to any extent whatever" in Section 21, it had in mind a chief or principal business as measured by a quantitative test.

The Board says that if "primarily engaged" be construed to mean chiefly or principally engaged, absurd consequences would follow.[21] But we do not see that the consequences would be more absurd than those which ensue when Section 20 is applied. That a principality of business be requisite to a prohibition is no more absurd than that 51 per cent of stock ownership be requisite. The Board urges that to except one of the large and important concerns from this prohibition would be absurd. If the interrelationship were 49 per cent, it would be excepted from the prohibition of Section 20. One seems no more absurd than the other.

Research by the court has revealed one, and only one, previous reference by the Board to the provision here involved.[22] Our idea that the connection is too remote to be helpful seems to have been shared by the Board as that ruling was neither cited nor mentioned by it in brief or argument. On the other hand, the same phrase in other statutes has been repeated-

---

[21] The Board remarks in its conclusions that if "primarily" be held to mean principally, the statute would apply to no one. So far as appears, this observation

is a speculative generality, which on the record cannot be treated as a finding of fact.

[22] 27 Fed.Reserve Bull. 399 (1941).

ly interpreted. For example, by Section 2(a) (3) of the Public Utility Holding Company Act of 1935,[23] the Securities and Exchange Commission was authorized to declare a company without the Act if it found certain facts, including one that the company "is primarily engaged in one or more businesses other than the business of an electric utility company," and, in another clause, if it "is engaged primarily in manufacturing"; similar phrases appear in Section 3(a) (3) [24] in relation to holding companies. The Commission has many times considered cases under the quoted language, and while we do not find that it ever defined the phrase, the findings of fact underlying its conclusions appear always to have been quantitative in nature and it uses the terms "principal business" and "principally engaged" as synonymous with "primarily engaged" (for example, The Cleveland-Cliffs Iron Company, 3 S.E.C. 326, 329, 330; Sloss-Sheffield Steel and Iron Company, 3 S.E.C. 460; Aluminum Company of America et al., 5 S.E.C. 640, 645; Fairbanks, Morse & Co., 8 S. E. C. 360, 361). In the International Paper Company case, 9 S. E. C. 937, 940, the Commission said:

"After having given consideration to the circumstances surrounding the sales of electric energy by applicant, particularly that the energy sold is generated by owned or leased facilities devoted primarily to applicant's own use, as well as to the quantum and relative percentage of such sales, it appears to the Commission that International Paper Company is primarily engaged in one or more businesses other than the business of an electric utility company within the meaning of the Public Utility Holding Company Act of 1935, * * *"

The full phrase in the Public Utility Holding Company Act relating to holding companies is "only incidentally a holding company, being primarily engaged or interested in one or more businesses other than the business of a public-utility company." The Commission held in the Cities Service

Company case, 8 S. E. C. 318, 329, that the entire phrase must be read together and that while the scope of the qualification is explained by the latter portion of the language, the " 'incidentally' phrase" must also be given effect.

"Primarily engaged" also appears in the Bankruptcy Act,[25] an exemption being granted a person "primarily bona fide personally engaged" in farming. The courts have had many cases involving this definition and uniformly recite quantitative tests.[26] They have used such expressions as " 'Primarily' means basically, or in such manner as to be of first importance or of principal concern"; [27] "The evidence does not support the conclusion that he was engaged chiefly in farming or tillage of the soil"; [28] and "His farming activities did not, we think, ever become his primary business." [29]

It is of some importance, in referring to the Public Utility Holding Company Act and the Bankruptcy Act as throwing some light upon the terminology of the Banking Act, that the three Acts were before Congress at the same time. The first was approved August 26, 1935,[30] a reenactment of the second on May 15, 1935,[31] and the third on August 23, 1935.[32]

Further in respect to the Board's statement that "primarily" should not be construed to produce an absurd consequence (with which statement we, of course, agree), in the light of the Senate Committee Report on the Banking Act, which we have discussed, we see a possible reason why Congress went only so far as to prohibit interrelationship between a bank and a security concern when the business of the latter is chiefly or principally underwriting. The evil at which this section of the statute was aimed was the possible selling of securities to the bank by its directors. Congress may well have considered that such practice is much more likely to occur where underwriting is the principal or chief business of a concern, than where underwriting is a lesser or secondary

---

[23] 49 Stat. 804, 15 U.S.C.A. § 79b (a) (3).

[24] 49 Stat. 810, 15 U.S.C.A. § 79c(a) (3).

[25] 47 Stat. 1470 as amended, 11 U.S. C.A. § 203, sub. r.

[26] Williams v. Great Southern Life Ins. Co., 5 Cir., 1941, 124 F.2d 38; Benitez v. Bank of Nova Scotia, 1 Cir., 1942, 125 F.2d 523; Swift v. Mobley, 5 Cir., 1928,

28 F.2d 610; Skinner v. Dingwell, 8 Cir., 1943, 134 F.2d 391.

[27] Benitez v. Bank of Nova Scotia, supra note 26, 125 F.2d at page 531.

[28] Swift v. Mobley, supra note 26.

[29] Skinner v. Dingwell, supra note 26, 134 F.2d at page 393.

[30] 49 Stat. 804.

[31] 49 Stat. 246.

[32] 49 Stat. 704.

interest. So it is not wholly unreasonable, in our view, that Congress laid the prohibition at that line.

■ At the same time, it may be, as the Board urges, that as a matter of policy, the national banking system should be divorced completely from concerns engaged in underwriting. But that question is not for the courts. Our function is merely to determine what Congress actually did in the statute before us. The Board could, and, if it so feels, should, present to the Congress its views on the problem of policy.

■ Collateral to the substantive question involved are the contentions of the Board that viewed as a suit against the Board, the action must fail because it is in effect a suit against the United States, which has not consented to be sued, and that the District Court is without jurisdiction to issue the writ of certiorari for the purposes sought.

The contention that the action for injunction is in effect a suit against the United States is without merit. Appellants seek to restrain an order of the Board on the ground that it is beyond the power of the Board. We need not pass upon the contention with respect to the jurisdiction of the court to issue a writ of certiorari, since we regard the action for injunction as the proper action.

Reversed.

EDGERTON, Associate Justice (dissenting).

I think the judgment should be affirmed. Eastman, Dillon & Co. are "Underwriters, Distributors, Dealers and Brokers in Industrial, Railroad, Public Utility and Municipal Securities." It seems to me a paradox to say that these underwriters are not primarily engaged in underwriting: are they, then, only incidentally engaged in underwriting? Everyone agrees that underwriting is one of the Eastman firm's primary businesses and brokerage another. I think it is equally true that they are "primarily engaged" in each, and not merely in both, of these businesses.

I think Congress used the word "primarily" in a sense which includes "essentially" or "fundamentally" and is not limited to "chiefly" or "principally." [1] These are all recognized senses of the word. The Oxford Dictionary includes "essentially", Webster's New International Dictionary includes "fundamentally", and Funk & Wagnalls' Standard Dictionary includes both "essentially" and "fundamentally", among the meanings of "primarily".

The court argues that we should not impute obscure meanings of ordinary words to Congress. Highly obscure and even wholly unheard-of meanings of ordinary words have sometimes been imputed to Congress in order to avoid a result which Congress did not intend. Thus in Holy Trinity Church v. United States [2] the Supreme Court, in order to shield a church from criminal liability, held that a clergyman does not perform any "labor or service". But there is nothing obscure or unusual about a meaning which is recognized, without the slightest suggestion of rarity or obsolescence, by most of the leading dictionaries. Unusual meanings of ordinary words, when they are recognized at all by these dictionaries, are marked "rare".[3] Meanings

[1] Since the meaning which words convey necessarily varies with their context, interpretations of the words "primarily engaged" in other statutes are only slight evidence of their meaning here. For example, it is a far cry from the premise that the International Paper Co. is "only incidentally a holding company" and is "primarily engaged" in the paper business, within the meaning of the Public Utility Holding Company Act, to the conclusion that the Eastman firm of underwriters is only incidentally and not primarily engaged in the underwriting business within the meaning of the Act before us.

[2] 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226.

[3] The following quotations illustrate the way in which these dictionaries distinguish between ordinary and unusual meanings of ordinary words.

"Casual * * * 1. Happening or coming to pass without design, and without being foreseen or expected. * * * 5. * * * Acting at random; undependable. Rare." Webster's New International Dictionary.

"Pleasant * * * 1. Giving or promoting pleasure * * * 2. Conducive to merriment or laughter; gay; lively; also (rarely), witty or facetious * * * 3. [Rare.] Excited with drink; alcoholically good-tempered." Funk & Wagnalls' New Standard Dictionary.

"Salt * * * 1. Impregnated with or containing salt; hence, having a taste like that of salt; saline * * * 5. Of speech, wit, etc.: Pungent, stinging. Now rare." Oxford Dictionary.

796

which are recognized without qualification are ordinary meanings. By ruling that "primarily" has no ordinary meaning except chiefly or principally, this court overrules the editors of Webster's, the Standard, and the Oxford dictionaries on a question of fact in their field. I think the court errs in deciding that meanings which three leading dictionaries regard as ordinary are in fact so rare that they cannot have been intended by Congress. The contradiction is not reduced by the court's suggestion that the words "essentially" and "fundamentally" add nothing to the sense of the definitions in which they occur.[4] A dictionary is not a book of synonyms. It purports to give meanings of terms, not to furnish alternative terms by which a given meaning may be expressed. "Essentially" and "fundamentally" mean what they say.

Choice between dictionary meanings is a normal process of statutory construction. It does not consist in deciding which meaning is the more usual. Its normal purpose and result are to give effect, as the Board did, to the probable intention of the legislature. This court's choice of a meaning for "primarily" is extraordinary in that its result is to defeat the intention of the legislature. It deprives § 32 of rational basis and of practical effect.

It is not disputed that what Congress aimed at in § 32 was the likelihood that if a bank director is interested, in the degree which Congress undertook to define as critical, in underwriting, the director may influence the bank or its customers to buy securities. This is made clear by the section itself.[5] In determining what interest in underwriting Congress undertook to define as critical, the question what interest might reasonably be thought critical is of great importance. Congress might reasonably think that if the director's employer is essentially engaged in underwriting, the director may be tempted to sell securities to the bank or its customers. Congress could not reasonably think that although the employer is so engaged, the fact that he is even more largely engaged in the related business of brokerage removes the temptation. The Board's interpretation attributes the rational theory, and this court's interpretation the irrational one, to Congress.

The Board says, and its statement is not disputed, that restricting the application of § 32 to firms whose underwriting business is first in volume would make this section "apply to no one". The court does not suggest that this result, which is no result at all, is the one which Congress intended. If the court's position is correct, the Act of Congress requires us to defeat the purpose of Congress. This seems to me another paradox.

The court argues that if Congress meant essentially it could have said essentially. It is equally true that if Congress meant principally it could have said principally. And the court overlooks the fact that in a different section of the same Act, and with regard to engaging in exactly the same group of activities, Congress did say principally. The "affiliate" section of the Act provides that a bank shall not, through control of stock or of directors, control an organization "engaged principally in the issue, flotation, underwriting, public sale, or distribution at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities."[6] But § 32, which defines the degree of engagement in the underwriting business that disqualifies a man as a bank director, rejects the phrase "engaged principally" which had been used in the affiliate section and uses instead the phrase "primarily engaged." It is reasonable and conventional to suppose that Congress made this change with a purpose. If so, Congress did not intend that "primarily engaged" should be interpreted as meaning "principally engaged."[7]

[4] The court's language is that essential and fundamental "are not synonyms of 'primary', and they overlap in meaning only when the implication of 'fundamental' or 'essential' is 'first' or 'principal' ". This amounts to saying that "essential" and "fundamental" never "overlap in meaning" with "primary"; for the implication of "fundamental" or "essential" is never "first" or "principal". The two pairs of words convey wholly different ideas. The dictionaries include neither of the second pair in definitions of the first pair, and neither of the first pair in definitions of the second.

[5] The section authorizes the Board to make regulations which permit men within the described class to serve as directors of a bank "when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments."

[6] 48 Stat. 188, § 20, 12 U.S.C.A. § 377.

[7] The opinion of the court points out that in § 21 of the Act, in prohibiting

From the fact that Congress made a "majority" of one sort critical in sections [8] of the Act where it used the word "majority," the court infers that Congress meant to make a majority of another sort critical in § 32 where it did not use the word. To me the opposite inference, if either, would seem to be suggested. But the contexts are so different that no inference is suggested. They are so different that the court's argument comes to this; by recognizing that majorities of *votes* control corporations, Congress implied that a man's qualification to serve as a bank director should turn upon a majority of the *business activity* in which he is engaged. The sections on which the court relies concern affiliates of banks. The purpose of Congress, in those sections, was to prevent banks from controlling underwriting corporations. Since control of a corporation depends upon control of a majority of directors, or ownership or control of a majority of voting shares or of shares voted, Congress made such majority control the measure of prohibited affiliation. In respect to the control of a corporation, 51 per cent of directors or of voting stock is a wholly different matter from 49 per cent. But in § 32 Congress did not aim at control, either of underwriters by banks or of banks by underwriters; [9] and even if Congress had aimed at control, the question whether underwriting was or was not a majority of a *firm's business* would still have been irrelevant to its purpose. Section 32 is aimed only at the likelihood that a bank director who is interested in the underwriting business may exert influence upon his bank or its customers in favor of that business. The likelihood that he will do this does not depend in any degree upon the question whether the underwriting business is 51 per cent or 49 per cent of the business in which he is interested. The fact that Congress expressly treated a majority of voting power as critical where it makes sense to do so has no tendency to show that Congress meant to treat a majority of business activity as critical where it would not make sense to do so.

The Board interpreted "primarily" as meaning "essentially" or the like. This interpretation is in accordance with the Board's rulings in other cases[10] and carries with it, as settled administrative practice always does, a strong presumption of correctness. If Congress intended to forbid this interpretation the Board made a mistake of law.[11] But it seems to me clear that this is not the case. Accordingly I do not undertake to say whether the record would support a finding that the Eastman firm are *principally* engaged in underwriting.[12]

---

underwriters from being engaged in banking, Congress used the phrase "engage * * * to any extent whatever." As the court points out, this makes it quite clear that when Congress, in § 32, prohibited bank directors from being "primarily engaged" in underwriting, Congress did not mean "engaged to any extent whatever." But no one contends that Congress meant that.

[8] 48 Stat. 162, 188, §§ 2 (b) (1), 20, 12 U.S.C.A. §§ 221a (b) (1), 377.

[9] The section makes no distinction between one director, who has no control, and a majority of directors.

If underwriting were 100 per cent of the business of a firm, that fact would give its employee no more control of a bank of which he was a director than he would have if underwriting were a trifling and non-essential part of the firm's business, but it would subject him to more temptation to exert his influence in favor of his employer's underwriting operations. Accordingly § 32 is, as all agree, so drawn that the employee is disqualified to serve as a bank director in the first case but not in the second.

[10] 27 Federal Reserve Bulletin 399 (1941).

[11] If Congress did not intend to forbid that interpretation, it is immaterial whether Congress intended to require it or only to permit it. "Congress may have intended the agency to determine the 'sub-principle' within the statutory framework. The vital factor is the intention of Congress, not the generality of the administrative application." Stern, Review of Findings of Administrators, Judges and Juries, 58 Harv.L.Rev. 70, 107.

[12] They put "Underwriters" first in their advertising, and they get all the underwriting business they can. This suggests primacy of interest and effort, which promote sales. For all that appears, they may get a larger *net* income from underwriting than from brokerage. A man may be principally engaged in the practice of law even if his transactions on the stock exchange are more numerous and more profitable, and employ more capital, than his legal transactions.