VIRGIN ISLANDS HOTEL ASSOCIATION (U.S.) INC., Plaintiff

v.

VIRGIN ISLANDS WATER & POWER AUTHORITY, Defendant

Civil No. 499-1971

District Court of the Virgin Islands

Div. of St. Croix

February 2, 1972

622

**WARREN H. YOUNG,** *Judge*

This is an action filed by the Virgin Islands Hotel Association (plaintiff herein) to enjoin the Virgin Islands Water and Power Authority (herein "the Authority") from continuing to give effect to a change in the electric power rate structure on grounds that the Authority "acted in gross disregard of the V.I.W.A.P. Act and of procedural due process". Motions for a temporary restraining order and for a preliminary injunction were denied, following two separate hearings on grounds that plaintiff failed to show that immediate and irreparable harm would ensue to plaintiff by denial of such temporary injunctive relief.

By agreement of counsel, an expedited evidentiary hearing was held on the merits of the complaint and answer. Following that hearing, the Court met with counsel for both parties and principals of the Authority in an unsuccessful attempt to effect a settlement. The Court must now face the issues on the merits as to the legality or illegality of the rate increase.

The Authority argues that the increase in the power rate (approximately amounting to a 20% overall increase) was necessitated and compelled by the demands to meet the bond covenant to maintain a 1.5 ratio of revenues to the debt service of the Authority's Series A Bonds. The Authority has outstanding nineteen million dollars in Series A Bonds. The bond covenant is in close danger of being violated (if not, in fact, has been violated) and it was urged by the Authority's consultants in municipal financing to take

623

positive steps to issue a rate to assure maintenance of the bond covenant ratio. Furthermore, the Authority has authorized the issuance of Series B Bonds in the amount of ten million dollars to cover its obligation of five million dollars on a bond anticipation note due March 1, 1972 and another bond anticipation note of five million dollars due March 17, 1972. In addition, the Authority has outstanding contract commitments totalling eight million dollars. Before the Authority can sell the Series B Bonds (to raise the ten million dollars in March, 1972) and before it can borrow against one or more bond anticipation notes (to cover the eight million dollars contract obligations), the Authority must obtain a favorable opinion from bond counsel. The Authority maintains that so long as the Authority is involved in pending litigation, bond counsel cannot render a favorable opinion. While this was a factor which caused me to make extra diligent efforts to effect a settlement of this litigation, it cannot serve as a relevant and controlling factor in deciding the merits of plaintiff's complaint herein. Furthermore, judicial notice is taken of a pending litigation brought by Baldwin-Lima-Hamilton suing the Authority for an alleged debt of $275,000, Baldwin-Lima-Hamilton v. Virgin Islands Water & Power Authority, Civil No. 544-1971, In the District Court of the Virgin Islands, Division of St. Thomas and St. John.

██ At the second full hearing on plaintiff's motion for a preliminary injunction, I stated my concern as to the standing of plaintiff to bring this suit, even though plaintiff's standing has never been challenged by the Authority. However, on reflection and on independent research, I am satisfied as to plaintiff's standing and the Court's jurisdiction herein. It is stated in Data Processing Service v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), that "the interest sought to be protected by the complainant is arguably within the zone of interest to be protected or

regulated by the statute. . . ." The Court also went on to point out, at 154, that "he who is 'likely to be financially' injured, may be a reliable attorney general to litigate the issues of the public interest in the present case", citing FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 477 (1939). See also Hardin v. Kentucky Utilities Company, 390 U.S. 1 (1967), and Abbot Laboratories v. Gardner, 387 U.S. 136 (1967).

It is also to be noted that in Data Processing Service, supra, at page 157, the Court stated, "there is no presumption against judicial review and in favor of administrative absolutism (Abbot Laboratories v. Gardner, 387 U.S. 136 (1967)), unless that presumption is fairly discernible in the statutory scheme."

The Court is further persuaded on the issue of jurisdiction by 4 V.I.C., Sec. 74 that this complaint falls within the legislative permission therein granted.

I believe that plaintiff would also have standing under the concept enunciated in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), as a "private attorney general". The Court there with regard to the issue of standing also pointed out, and with this I wholeheartedly concur, "our experience with public actions confirms the view that the expense and vexation of legal proceedings is not lightly undertaken." Id. at 617. See also Powelton Civic Home Own. Ass'n. v. Department of Housing and Urban Development, 284 F.Supp. 809, 826 (E.D. Pa. 1968).

█ █ As noted before, both parties agree that the issue before the Court is the legality of the procedure by which the Authority increased its rates. This is important because this is an action to enjoin said rate increase and not an appeal from an agency decision. The difference is not merely one of semantics for unlike an appeal the scope

of review for an injunction is broader than that when an appeal is involved. The interpretation of a statute is a matter of law and in a suit to enjoin agency action, a Court is free to substitute its own judgment for that of the administrator. In other words, "(i)t is the right to challenge, not the extent of the remedial power, which must first be considered:" Agnew v. Board of Governors, 153 F.2d 785 (D.C. Cir. 1946), rev'd on other grounds 329 U.S. 441, 67 S. C.A. 411, 91 L.Ed. 408 (1946).

The Authority asserts the legality of its procedure based on its interpretation of the statute which created it. It is noteworthy that the statute, 30 V.I.C. 101 et seq., makes no provision for review of the Authority's actions, but this cannot mean that affected persons have no redress for illegal conduct on the Authority's part. In Agnew the Board attempted to assert an unchallengeable right to its interpretation of a statute which was "administrative absolutism" of a sort the Court could not countenance.

The issue before the Court, therefore, is (1) whether the proper procedure was employed to arrive at a reasonable rate and (2) whether plaintiffs were afforded the hearing they alleged to be required by the Act establishing the Water and Power Authority. They contend in essence as to the latter that they were denied procedural due process. The Water and Power Authority Act, Title 30, Sec. 101 et seq. provides in pertinent part (Sec. 105, subsec. 12) that the Authority "shall determine, fix, alter, charge, and collect reasonable rates, fees. . . ."

Subsection 12 further provides that initially the Authority

"shall adopt the existing rates, fees and other charges for water and power, and that, thereafter, before changes in such general structure for water or electrical power are made, or, in cases where the Board shall decide to make such charges and deem the immediate effectiveness thereof to be necessary, then within a

reasonable time after such charges are made, a public hearing shall be held with respect thereto before the Board, or before such hearing officer or officers as the Board may designate to give interested persons an opportunity to advise the Board of their views and of evidence and support thereof, and upon such a hearing, the Board, pursuant to the powers, duties and obligations vested in it by this chapter, may alter, suspend or revoke such charges."

■ I begin with the proposition enunciated in Price v. Philadelphia Parking Authority, 221 A.2d 138, 145, 1966, that there is a

"recognition of the need to subject the activities of public authorities to judicial scrutiny. As public bodies, they exercise public powers and must act strictly within their legislative mandates. Moreover, they stand in the fiduciary relationship to the public which they are created to serve and their conduct must be guided by good faith and sound judgment. (Citations omitted.) The mushrooming of and the frequent complaint that such bodies act in an arbitrary and capricious manner, dictate that a check rein be kept upon them. (Citations omitted.) These considerations dictate that the independence of authorities from some of the usual restrictions on governmental activity not be extended so as to insulate them from judicial scrutiny through the medium of taxpayers' suits."[1]

I, therefore, reject the suggestion on the part of the Authority made during the settlement negotiations that the action of the Authority is not subject to judicial review.

■ The Court, of course, does not here challenge the authority of the defendant to set rates in accordance with its legislative mandate. The cases are numerous which support the proposition that this is a proper legislative delegation of power and so long as the Authority acts within what has been delegated to it it is beyond judicial review. I do not accept the proposition, however, that all

---

[1] While the language cited deals with the standing of taxpayers to challenge the validity of the actions of these public authorities, the language cited is consonant with and relevant to the problem before the Court.

actions undertaken by any public authority necessarily comport with the legislative mandates creating them.

 Throughout the proceedings the Authority has constantly implied that it faces a grave crisis and emergency. While this may be true, and the Court fully agrees that the Authority does face a grave emergency, it is also true that this is an emergency which was foreseeable and has been for some time. It is on this basis that the Authority grounds its decision to make a rate increase and then grant a hearing to the public as to the reasonableness of those rates, but it should be noted that an agency may not "take precipitate action without a hearing on the ground that it can always cancel out and reconstruct if so advised after hearing. To act in haste, repent at leisure, is not a sound motto for an administrative agency." Pennsylvania Gas and Water Co. v. Federal Power Commission, 427 F.2d 568, 575 (D.C. Cir. 1970). City of Portland, Oregon v. Federal Maritime Com'n., 433 F.2d 502 (D.C. Cir. 1970).

 In this connection it is well to recognize that the Authority by statute is clothed with a public interest. 30 V.I.C. Sec. 101(f) states "The provisions enacted by this chapter are hereby declared to be necessary in the public interest. . . ." The statement in F.P.C. v. Sierra Pacific Power Co., 350 U.S. 348, (1955), that "The purpose of the power given to the Commission. . . . is the protection of the Public Interest, as distinguished from the private interests of the utilities, as evidenced by the recital in the Act that the scheme of regulation imposed is necessary in the public interest", is apropos here. That is, in applying that case to the one at bar, I am not of the opinion that the procedure by which the rates were established reflect an appreciation by the Authority of the legislative mandate as to the public interest.

 Title 30 V.I.C. Sec. 105(12) charges the Authority with determining reasonable rates. This must be read in

conjunction with the mandate to hold a public hearing in the event rates are increased pursuant to a determination that their "immediate effectiveness" was necessary. A "determination" must be "the result of a process of reasoning. It cannot be an arbitrary fiat contrary to the known facts. This is inherent in the meaning of 'determination'. It is implicit in a government of laws and not of men." Anti-Fascist Committee v. McGrath, 341 U.S. 123, 136 (1951).

In the colloquy between Fred Clarke and the board members much was made of the fact that a "determination" rather than a decision had been made (Exhibit J, p. 36–43). But if a determination had been made, on what basis was it done?

Valentine Lehr, qualified as an expert over defendant's objection, testified that in the field of utility services reasonable rates are based on three factors, to wit:

(1) Cost of production (this would include labor and fuel cost).

(2) Load projections and development of the utility.

(3) Analysis of the type of consumer or consumers which the utility services.

He testified that a rate schedule should reflect the above three factors and that the proposed rate schedule, or indeed the schedule which was in effect as of December 1, 1971, did not do so and for that reason the rate increase is invalid. Mr. Lehr testified that the Jackson and Moreland Report, introduced into evidence as Exhibit B, was not a rate study, but was rather a revenue study and did not therefore contain the kind of information upon which a proper rate study could be based. Mr. Lehr further testified that he doubted whether the requisite information needed to make a rate study was kept or was available and he cited in support of this the failure of the Authority to keep separate accounts for water and power.

 This testimony was supported by defendant's own witness, Hans Loeffler. On recross-examination he testified in essence that the Authority could not determine whether the "overall rate structure (was) fair" for the reason that a proper rate study had not been made. It is, therefore, evident that a proper determination had not been made. This is the type of administrative determination condemned in Anti-Fascist Committee, supra, where the Court also held that "(w)here an act of an official plainly falls outside of the scope of his Authority, he does not make that act legal by doing it and then invoking the doctrine of administrative construction to cover it." 341 U.S. at 136. Nor is it sufficient for a determination that there had not been an increase in electric rates for the past ten years. I do not here decide whether this was the best determination but only whether it was reasonable and permissible. Williams v. Robinson, 432 F.2d 637 (D.C. Cir. 1970).

 I agree with plaintiffs that the hearing denied them requisite procedural due process safeguards. I am impressed in the first instance with the fact that the hearings which were held were before the very Authority which has in the first instance promulgated the increased rates and the person designated as hearing officer is the Attorney General of the Virgin Islands, who represents the Authority in these proceedings.

There is authority that a rate-fixing procedure is a legislative or quasi-legislative proceeding and, therefore, no hearing is constitutionally required. But "(s)ounder is the view of the Supreme Court in the Morgan case that where facts about the companies were in dispute, 'a proceeding of a quasi-judicial character' (Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288 (1936)) was required, even though rate fixing for the future was involved and even though it had been clearly established that

rate fixing for the future was 'legislation, or rule making'."
Davis, Administrative Law Treatise, Sec. 29.02, p. 126.

 Once a hearing is granted, those appearing are entitled to all procedural safeguards to insure that the hearings are fair and orderly. The type of hearing which insures the above embraces not only the right to present evidence, but also "a reasonable opportunity to know the claims of the opposing party and to meet them." Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773 (1938).

The hearing provided for must be quasi-judicial and it is obvious that plaintiff was not afforded "a reasonable opportunity to know the claims of the opposing party", and the evidence on which the Authority would rely prior to the hearing. The only opportunity apparent here was the somewhat cavalier offer by Mr. Newman to Lon Southerland at the hearing in Christiansted that he could come to Newman's office at any time to inspect his files (Exhibit J, p. 26–27). It is important in this respect to note that the hearings were held one week after the Authority announced the date of the public hearings. (Exhibit Q.) While this may be sufficient time for other types of hearings, the issue involved here was so complex that due process requires a longer period of time for the public to marshall its forces and to scrutinize the evidence on which the Authority would rely. Indeed, it appears that the Jackson and Moreland report, the primary source for the determination that a rate increase was necessary, was only made available to the public at the hearing on November 18. (Exhibit J.) Is it any wonder therefore that "the public seemed apathetic"? (Exhibit K.)

I reiterate that I do not decide here that the rates are unreasonable—it may well be that they are for the reason that they should be even higher. I merely hold that the procedure by which they were increased was fatally tainted because of the violation of very fundamental notions of fairness.

631

■ The prospect of an emergency in electrical service caused by any default in the covenants of the Series "A" Bonds, the unmarketability of Series "B" Bonds and an inability of the Authority to acquire financing for expansion of services and facilities, poses a realistic consideration for the Court. Therefore, the injunction will issue but the order will be stayed for a period of ten months. Testimony given in the hearings herein have indicated that a proper rate study (and not just a revenue study) will cost somewhere between $60,000 to $100,000 and will take from four to six months. A stay period of ten months should enable the Authority to make a proper determination of a rate schedule and to provide proper public hearings on the proposed rate schedule and the rate study supporting the proposed schedule. If, within that period, it shall be determined that the present rates should be lower, the Authority will have to take appropriate measures to reimburse the power consumers or to allow them a credit for the difference involved in the present rates and the ones which will be properly made. On the other hand, if the determination and subsequent proper public hearings shall support a finding that the present rates are reasonable, then the Authority will not have lost the revenues represented by the recent increase in the rates.