RAILROAD RETIREMENT BOARD et al.
v. DUQUESNE WAREHOUSE CO.

No. 8894.

United States Court of Appeals
District of Columbia.

Argued March 19, 1945.

Decided May 14, 1945.

Writ of Certiorari Granted June 11, 1945.
See 65 S.Ct. 1558.

508

Mr. Myles F. Gibbons, General Counsel, Railroad Retirement Board, of Chicago, Ill., with whom Mr. David B. Schreiber, Assistant General Counsel, Clara J. Cain, Attorney, and Sidney B. Jacoby, Attorney, all of the Railroad Retirement Board, of Chicago, Ill., were on the brief, for appellant Railroad Retirement Board. Mr. Charles B. Murray, Assistant United States Attorney, of Washington, D. C., also entered an appearance for Railroad Retirement Board.

Mr. Willard H. McEwen, of Toledo, Ohio, with whom Messrs. Frank L. Mulholland, of Toledo, Ohio, and Edward C. Kriz, of Washington, D. C., were on the brief, for appellant Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.

Mr. George R. Allen, of Philadelphia, Pa., pro hac vice, by special leave of Court, with whom Messrs. John Spalding Flannery and R. Aubrey Bogley, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The Duquesne Warehouse Company, appellee, brought these proceedings to set aside the decision of the Railroad Retirement Board, appellant, which declared that appellee was an employer within the meaning of the Railroad Unemployment Insurance Act 45 U.S.C.A. § 351 et seq. The court below reversed the Board and gave a summary judgment in favor of appellee warehouse company. From that judgment this appeal is taken.

It is conceded that appellee is a wholly-owned subsidiary of the Pennsylvania Railroad Company. The Board found that appellee was operating two warehouses equipped with platform sidings and other facilities for the receipt, delivery, and other handling of in-bound and out-bound freight transported by the Pennsylvania Railroad Company. Both of these warehouses were served by Pennsylvania's railroad tracks. One warehouse at East Liberty, Pennsylvania, handles only sugar in carload lots. which appellee unloads from or reloads on Pennsylvania's cars for the account of the shipper. The other warehouse, in Pittsburgh, handles diverse commodities coming in by both rail and truck in both carload and less-than-carload lots. Incoming less-than-carload shipments are unloaded and delivered to appellee on its platform by the railroad. Outgoing less-than-carload shipments are delivered to Pennsylvania's platform by appellee. Pennsylvania Railroad then issues its bill of lading, loads the freight and moves it out. Appellee's Pittsburgh warehouse is also an agency of the Pennsylvania Railroad to dispose of damaged freight which has been either refused by the shipper or is unclaimed. Appellee also renders storage-in-transit service. This means that when a carload of freight is shipped to a designated point over the railway, then taken out of the cars and stored in the warehouse and then is subsequently reshipped over the railroad, it is entitled to the through rate to the designated point instead of the combination of local rates to the warehouse and thence to the transit point.

The various types of operations in which appellee is engaged in connection with Pennsylvania's railroad transportation are shown by the following analysis of appellee's revenues from 1936 to 1938:

|  | Storage and handling of freight under storage-in-transit privileges | Storage and handling of other freight (including freight coming in or going out, or both, over Pennsylvania's rails) | Sale of damaged merchandise | Subleasing of space to manufacturing concerns |
|---|---|---|---|---|
| 1936 | $ 59,570.40 | $ 63,011.60 | $ 8,599.00 | $32,732.00 |
| 1937 | 30,239.93 | 91,545.99 | 11,409.00 | 24,967.00 |
| 1938 | 29,836.01 | 73,702.99 | 8,881.86 | 16,035.17 |
|  | $119,646.34 | $228,260.58 | $28,889.86 | $73,734.17 |

On the basis of these detailed findings the Board found generally that the appellee's operations were "intimately and integrally related to Pennsylvania's railroad transportation" and that appellee was engaged "in the non-casual operation of equipment and facilities and the performance of non-casual service in connection with Pennsylvania's transportation of property by railroad, * * * and the receipt, delivery, transfer in transit, storage, and handling of property transported by Pennsylvania by railroad." The Board concluded as a matter of law that appellee was an employer within the meaning of Section 1(a) of the Railroad Unemployment Insurance Act and that compensated service rendered to appellee was creditable for the purpose of that Act.

The Act itself,[1] deleting the language not relevant here, defines an "employer" as follows:

"The term 'employer' means * * * any company which is directly * * * owned * * * by one or more * * * carriers * * *, and which operates any * * * facility or performs any service (except * * * casual service, and the casual operation of equipment or facilities) in connection with the transportation of * * * property by railroad, or the receipt, delivery, * * * storage, or handling of property transported by railroad, * * *."

In its opinion the Board summarized its reasons for concluding that the operations of appellee made it an employer under the Act in the following language:

"In light of the general purpose of the * * * [Railroad Unemployment Insurance Act] and accepted doctrines of statutory construction, the Board has construed the carrier affiliate coverage provision as denoting services which are an integral part of, or are closely related to, the rail transportation system of a carrier and as including within its coverage (1) carrier affiliates engaged in activities which are themselves railroad transportation or which are rendered in connection with goods in the process of transportation, such as loading and unloading railroad cars, receipt, delivery, transfer in transit, and other handling of property transported by railroad; and also (2) carrier affiliates engaged in activities which enable a railroad to perform its rail transportation, such as maintenance and repair of way and equipment, and activities which enable a railroad to operate its rail system more successfully and to improve its services to the public such as auxiliary bus transportation, dining facilities, and incidental warehousing services."

We agree with the Board's construction of the Act.[2] It follows the ordinary meaning of the words used in the statute. It achieves a common sense result well within what we conceive to be the policy of Congress, i.e., to cover the business of railroading as it is actually carried on. That the service rendered here is one habitually carried on by railroads as part of their business has been declared by the Supreme Court in the case of Baltimore & O. R. Co. v. United States,[3] where the Court observed that

"All of the carriers 'now generally store freight on piers owned or leased by them and in warehouses operated by affiliated or subsidiary companies.' This business is carried on in various ways. Some carriers lease space to shippers for warehousing; others have aided in financing structures on their property in which they lease space from their own subsidiaries; and still others own directly the buildings and lease them to subsidiaries for warehouse operations. In all cases the carriers exercise sufficient control over the warehouse facilities to make them subservient to the competitive needs of the carriers. Their entrance into warehousing was brought about by a desire to induce shippers to use particular rail facilities and as first one and then the other of the carriers gained traffic by their warehouse conveniences, it seemed necessary for their competitors to equip themselves with similar advantages."

We cannot believe that operations habitually carried on by railroads in connection with their transportation service and intimately connected with that service are not part of the business of railroading which the Act is intended to cover.

[1] 52 Stat. 1094, Act June 25, 1938, 45 U.S.C.A. § 351(a).
[2] In the case of Duquesne Warehouse Co. v. Railroad Retirement Board, 148 F.2d 473, the Circuit Court of Appeals for the Second Circuit has held to the contrary in construing identical language in a companion act, the Railroad Retirement Act, 45 U.S.C.A. § 228a. We agree with the views of Judge Frank in his dissenting opinion filed in that case.
[3] 1939, 305 U.S. 507, 516, 517, 59 S.Ct. 284, 287, 83 L.Ed. 318.

■ We will briefly discuss the contentions of the appellee. In the first place, it argues that the descriptive phrase "service in connection with the transportation of property by railroad" refers only to property in actual movement over the rails. For example, part of the service rendered by appellee is the disposition of damaged freight refused or unclaimed by the shipper. Such freight has to be stored and disposed of. During such storage it is no longer in movement. Hence appellee argues that such service is not in connection with the transportation of property. Instead it is a separate and independent enterprise like the independent business of warehousing. This strained construction of the language is rendered even more difficult by the fact that the Act includes "service * * * in connection with * * * *storage, or handling* of property *transported* by railroad." The participle "transported" is certainly in the past tense. Appellee answers that by interpretation we must change the word "transported" to "being transported". This gets the desired result but it incidentally compels us to limit the term "storage" to enclosure in moving freight cars. This seems more ingenious than plausible.

A second contention of the appellee is that the phrase "in connection with the transportation of property" was taken from the Interstate Commerce Act and must be limited to the kind of service which comes within the coverage of the Interstate Commerce Act. We can find no evidence that such a limitation was intended.[4] It is true that the section we are construing does not apply to carriers *unless* they are subject to the Interstate Commerce Act. But the Hearings make it clear that all services performed by such carriers as part of the business of railroading are covered. That business is, of course, not restricted to the obligations which a railroad is compelled to perform as a minimum requirement of the Interstate Commerce Act.

■ Finally, it is argued that the legislative history of the Act compels the narrow interpretation urged by appellee. In support of this the appellee quotes from the testimony of witnesses at the hearings. Individual opinion of witnesses at a hearing is of doubtful value in the interpretation of an act.[5] But giving it full weight here, the testimony concerning the coverage of the Act goes no further than to show that the Act was not intended to be extended beyond services in connection with transportation which were habitual and intimately connected with railroad operations. For example, the operation of a water carrier was held not to be such a service in the case of Walling v. Baltimore Steam Packet Co.[6]

■ The Board's interpretation of the Act is unquestionably entitled to respect by this court.[7] In the case before us there seems no reason for setting it aside and every reason for affirming it.

The judgment of the court below will be reversed and the cause remanded to enter a summary judgment affirming the decision of the Railroad Retirement Board.

Reversed and remanded.

---

[4] The only support for this interpretation is found in the hearings on the Railroad Labor Act of 1934, 45 U.S.C.A. § 151, which contained similar language. Hearings before the Committee on Interstate Commerce, U. S. Senate, 73rd Cong. 2d Sess. (1934), S. 3266, pp. 10–11. Mr. Eastman testified that he thought this would be a possible interpretation of the language of the proposed bill. The Chairman of the Committee stated that it is "rather poor legislation, isn't it, generally", for one act to be interpreted by another. Mr. Eastman then stated: "I am not sure the language as it stands does cover all that it is intended to cover." The bill as finally passed does not appear to have included this limitation. The phrase "performs any service * * * in connection with the transportation of * * * property by railroad," is not included in the Interstate Commerce Act.

[5] McCaughn v. Hershey Chocolate Co., 1931, 283 U.S. 488, 493, 494, 51 S.Ct. 510, 75 L.Ed. 1183.

[6] 4 Cir. 1944, 144 F.2d 130.

[7] Skidmore v. Swift & Company, 1944, 323 U.S. 134, at page 140, 65 S.Ct. 161, at page 164:

"We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litgants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."