**ITEL CORPORATION, Petitioner,**

v.

**UNITED STATES RAILROAD RETIRE-MENT BOARD, Respondent.**

No. 82–2899.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1983.

Decided June 23, 1983.

Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for petitioner.

Thomas W. Sadler, Gen. Atty., Railroad Retirement Bd., Chicago, Ill., for respondent.

Before CUDAHY and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

SWYGERT, Senior Circuit Judge.

This appeal challenges the United States Railroad Retirement Board's ("the Board") ruling that as of July 1, 1975 the Rail Division of ITEL Corporation ("ITEL") is an employer within the meaning of the Railroad Unemployment Insurance Act ("RUIA"), 45 U.S.C. § 351(a) (1976), and the Railroad Retirement Act ("RRA"), *id.* § 231(a)(1) ("the Acts"). We reverse.

I

The facts are undisputed. Until recently, the major part of ITEL's revenues was derived from the sale, lease, and lease underwriting of computer systems. Since 1979, however, ITEL has suffered significant losses in its computer business, and, in 1981, ITEL petitioned for reorganization under Chapter 11 of the Bankruptcy Code. In 1978 the Rail Division accounted for 35 percent of ITEL's revenues and 28 percent of ITEL's operating income. In 1980 ITEL's Rail Division accounted for 36 percent of ITEL's assets and 15 percent of ITEL's employees, providing $33 million in operating income to ITEL. Because ITEL is principally engaged in business wholly unrelated to rail transportation, *see* 20 C.F.R. § 202.9 (1982), the Board found that only the Rail Division is an employer under RUIA and RRA.

ITEL's Rail Division was established in the early 1970's. It originally arranged lease financing of rail cars and locomotives, acting as a broker to arrange the financing of these purchases by other companies. Several years later the Rail Division shifted its focus, purchasing rail cars and leasing the rail cars to railroads. The Rail Division's lease financing activities were abandoned in 1979.

The Rail Division has a fleet of 15,600 railroad cars. The bulk of the Rail Division's business involves leasing rail cars to short-line railroads. The Rail Division monitors the rail cars' movements and accounts for and collects payments due lessees from non-lease railroads pursuant to Interstate Commerce Commission regulations. The Rail Division also sells this monitoring, accounting, and collecting service to non-lessee railroads. In some cases, the Rail Division is also responsible for the repair and maintenance of its cars. This work is not directly performed by the Rail Division employees. In addition, the Rail Division leases truck trailers to railroads for use in trailer-on-flatcar service. ITEL has several flat-rate/fixed-payment leases with larger railroads.

In July 1975 ITEL acquired the first of four small railroads. It is uncontested that these railroad subsidiaries and their 447 employees are subject to RRA and RUIA. About 12 percent of the Rail Division's railcars are leased to these subsidiary railroads and less than 5 percent of Rail Division employees are involved in transactions with the subsidiary railroads. Since the acquisition of the railroads, the Rail Division has not performed any transportation service for the railroad subsidiaries that the railroads previously provided for themselves.

II

■ A "reasonable basis" test is appropriate when passing upon an agency's construction of the statutes which it administers. *Paden v. United States Department of Labor,* 562 F.2d 470, 473 (7th Cir.1977).

When faced with a problem of statutory construction, the Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory

term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153 [67 S.Ct. 245, 250, 91 L.Ed. 136]. *See also, e.g., Gray v. Powell,* 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; *Universal Battery Co. v. United States,* 281 U.S. 580, 583 [50 S.Ct. 422, 423, 74 L.Ed. 1051].

*Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

█ Congress has entrusted the Board with the authority to make employer/employee determinations under the statutes it administers. 45 U.S.C. §§ 231f(b)(1), 362(*l*). The Board's interpretation of RRA and RUIA is entitled to deference if it has a reasonable basis in law. *Railroad Retirement Board v. Duquesne Warehouse Co.,* 149 F.2d 507, 510 (D.C.Cir.1945), *aff'd,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946); *Brotherhood of Railway and Steamship Clerks v. Railroad Retirement Board,* 239 F.2d 37, 42–43 (D.C.Cir.1956); *Southern Development Co. v. Railroad Retirement Board,* 243 F.2d 351, 353 (8th Cir.1957).

### III

At issue is whether the Board's interpretation of the definition of an employer under the RUIA and RRA to encompass ITEL's Railroad Division has a reasonable basis in law. Sections 1(a) and 1(b) of the RUIA, 45 U.S.C. §§ 351(a), (b) provide in relevant part:

(a) The term "employer" means any carrier (as defined in subsection (b) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or *under common control* therewith, and which operates any equipment or facility or *performs any service* (except trucking service, casual service, and the casual operation of equipment or facilities) *in connection with the transportation of passengers or property by railroad* or the receipt, delivery, elevation, transfer in tran-

sit, refrigeration or icing, storage, or handling of property transported by railroad. . . .

(b) The term "carrier" means an express company, sleeping-car company, or carrier by railroad, subject to part I of the Interstate Commerce Act.

(Emphasis added.) An employer covered by the RRA is defined as:

(i) any express company, sleeping-car company, and carrier by railroad, subject to part I of the Interstate Commerce Act;

(ii) any company which is directly or indirectly owned or controlled by, or *under common control* with, one or more employers as defined in paragraph (i) of this subdivision, and which operates any equipment or facility or *performs any service* (except trucking service, casual service, and the casual operation of equipment or facilities) *in connection with the transportation of passengers or property by railroad,* or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad. . . .

45 U.S.C. § 231(a)(1) (emphasis added). The Board and ITEL agree that these definitions are in all relevant aspects identical.

█ ITEL contends that the Board's construction of "under common control" and of "performs any service in connection with the transportation of passengers or property by railroad" ("the transportation clause") is unreasonable. Because we find that the Board's construction of the transportation clause does not have a reasonable basis in law, we reach only that issue.

If the services performed by the Rail Division were covered by the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101 *et seq.* (Supp. V 1981), there would be no question that the Board's decision would have a reasonable basis in law. *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946). In *Duquesne,* the Board had determined that Duquesne, a wholly-owned subsidiary of the Pennsylvania Railroad Company, was an employer within the meaning of RRA and RUIA. Duquesne operated

two warehouses owned and leased to it by its rail carrier parent. The service Duquesne provided was storing, loading, and unloading products carried by the Pennsylvania's rail cars. Duquesne billed shippers for these services. *Id.* at 449–50, 66 S.Ct. at 239. The Board argued that the Acts' definition of "employer" was broader than the statutory definition of the ICA, stressing the broad sweep of the language and the Acts' purpose to encompass "affiliates which carry out portions of the railroad's business." *Id.* at 452, 66 S.Ct. at 241 (footnote omitted). Duquesne argued that the Acts reached only activities covered by the ICA. *Id.* The Court did "not find it necessary to resolve that controversy. At the very least the [Acts' definitions of "employer"] embrace activities which form a part of transportation service within the meaning of the Interstate Commerce Act." *Id.* at 453, 66 S.Ct. at 241.

Because the Rail Division's activities are not covered by the ICA, *see Ellis v. ICC,* 237 U.S. 434, 443, 35 S.Ct. 645, 646, 59 L.Ed. 1036 (1915); *accord, General American Tank Car Corp. v. Eldorado Terminal Co.,* 308 U.S. 422, 428, 60 S.Ct. 325, 329, 84 L.Ed. 361 (1940), this appeal presents the controversy left unresolved by *Duquesne.*[1] Our examination of the legislative history shows that the activities embraced by the RRA and RUIA were intended to be no broader than those embraced by the ICA. Reviewing the legislative history of the Acts, the *Duquesne* Court found that the definition of "employer," including the transportation clause, derived directly from the Railway Labor Act, 48 Stat. 1185, 45 U.S.C. § 151, First, which, in turn, originated in the ICA, 41 Stat. 474 (1920) (codified at that time at 49 U.S.C. § 1(3)(a)). 326 U.S. at 451. Commenting on the language that became the definition of "carrier" in the Railway Labor Act, the source of the RRA and RUIA

employer definitions, *see* 326 U.S. at 451 n. 5, Mr. Eastman, Federal Coordinator of Transportation and chief sponsor of the bill, stated:

> Now, summing that up, it includes with those carriers subject to the provisions of the Interstate Commerce Act, *i.e.,* all railroad companies and express companies and sleeping-car companies, and all companies which are directly or indirectly owned or controlled by the railroads and which perform service or furnish facilities in connection with transportation service performed by the railroads, and the *definition includes words descriptive of such transportation service which are taken from the provisions of the Interstate Commerce Act.*

Hearings on H.R. 7650, 73d Cong., 2d Sess. 17 (1934) (emphasis added). The statutory language Mr. Eastman was referring to was:

> [A]ny company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such "carrier."

*Id.*

The RRA and RUIA contain the additional phrase "of passengers or property by railroad." The RRA and RUIA legislative history does not indicate precisely what purpose this addition served, but it is likely that the addition merely clarifies that coverage extends to services performed in connection with both freight and passenger rail

---

1. The dissent asserts that an "implicit, and false, premise of the majority's argument is that the Rail Division's leasing activities are not regulated under the Interstate Commerce Act because the leasing of cars is not a transportation service as defined in § 1 of the Interstate Commerce Act...." Dissent at 1250. This premise, however, is not the majority's; it

is the premise of the Board itself. In its brief to this court, the Board stated, "[i]t is clear that the leasing of freight cars is not a transportation service within the meaning of the Interstate Commerce Act ...." (Board brief at 18.) The Board, at least, agrees with our reading of *General American Tank Car Corp., supra,* and *Ellis, supra.*

transportation. The legislative history of the Railway Labor Act provides support for this view. A similar modification to the Railway Labor Act was proposed but not adopted. Mr. Eastman commented on the modification:

> In line 4 on page 2, it has been suggested that after the word "transportation" there should be inserted the words "of passengers or property by railroads" and then go on with the words "receipt, delivery, elevation," and so forth.
>
> I see no objection to that amendment. The language as drawn refers to transportation and property, and this amendment is intended to make it clear that transportation of passengers is also to be included.

*Id.*[2]

The Board points to two cases since *Duquesne* in which employers providing services not embraced by the ICA were found to be employers within the meaning of RUIA and RRA. In *Southern Development Co. v. Railroad Retirement Board,* 243 F.2d 351 (8th Cir.1957), a rail carrier established a wholly-owned subsidiary to operate and maintain the railroad's office building. The employees of the subsidiary were originally employees of the railroad, and, by virtue of the railroad's actions, the railroad sought to deprive these employees of their RRA and RUIA benefits. *Id.* at 354–55 n. 1. There was no question that the railroad's actions intentionally undermined the Acts. *Id.* at 354. Similarly, in *Despatch Shops v. Railroad Retirement Board,* 153 F.2d 644 (D.C. Cir.1946), a wholly-owned subsidiary which performed repair and construction of rolling stock and whose primary function was to serve its railroad parent was found to be an employer under RUIA and RRA.

If Despatch, in this situation, is not an "employer" under the terms of the Act, it can be readily seen that the railroads would be free to take from under the Act virtually all of their workers whose employment is in the "supporting" activities, through the simple expedient of setting up wholly owned corporate affiliates to perform these services. It is conceivable that everything from maintenance-of-way through engineering or bookkeeping might be done by so-called "independent" corporations. The application of this Act and of the other Acts passed for similar purposes and embodying the same language could be so severely limited as to render them of little worth in achieving the purposes for which they were passed.

*Id.* at 646.

ITEL's situation is easily distinguished from *Southern Development* and *Despatch.* The Rail Division's primary function is not to serve ITEL's rail carrier subsidiaries. Only eleven percent of the Rail Division's business is with the subsidiaries. The Rail Division did not attempt to subvert the Acts by removing workers formerly covered by the Acts. Rail Division employees were not covered by the Acts prior to ITEL's acquisition of the railroad subsidiaries. Since acquisition, the Rail Division performs no services for the railroads which they previously performed for themselves. As such, the *Southern Development* and

---

**2.** Another difference between the ICA and RRA and RUIA employer definitions deserves brief comment. The definition of "transportation" in the ICA reaches services:

> *related to that movement* [of passengers or property, or both] including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(24)(B) (Supp. V 1981) (emphasis added).

The definition of "transportation" in the RRA reaches service:

> *in connection with* the transportation of passengers or property by railroad, or the re-

ceipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad.

45 U.S.C. § 231(a)(1)(ii) (1976) (emphasis added).

Until the reenactment and codification of the ICA, Pub.L. No. 95–473, §§ 1, 2, 92 Stat. 1338 (1978), the ICA utilized the term "in connection with." *See* 49 U.S.C. § 1(3)(a) (1976). Congress expressly provided that the 1978 codification was intended to "restate, without substantive change" the prior law and "may not be construed as making a substantive change in the laws replaced." Pub.L. No. 95–473 § 3(a), 92 Stat. 1466 (1978).

*Despatch* justifications for extension of the transportation clause are absent.

While the statutory language, legislative history, and case law do not provide support for the Board's ruling here, the Board contends that its ruling is consonant with Congress' purpose in enacting RRA and RUIA. The Board argues that Congress intended to create a broad system of social insurance for all workers involved in the rail industry. However, the Rail Division employees, unquestionably workers involved in the rail industry, were not covered by the Acts prior to ITEL's acquisition of the railroad subsidiaries. If Congress intended to create the broad system of social insurance which the Board advocates, it would be illogical for Congress to define "employer" to exclude ITEL's Rail Division employees prior to the acquisition of the rail carrier subsidiaries.

Additionally, if Congress intended to create such a broad social insurance system, the Board offers no reason why Congress consciously drew the definition of services from the ICA. *See Duquesne, supra,* 326 U.S. at 451, 66 S.Ct. at 240. At least with respect to the RUIA, the legislative history indicates why the employer definition was drawn directly from the ICA.

The bill provides for a system of unemployment insurance for the same employees as are covered by the Railroad Retirement Act of 1937, and the support of such system of unemployment insurance through contributions collected from the same employers as are subject to the Railroad Retirement Act of 1937. At present these employees and employers are included within the unemployment insurance acts of the various States. *Especially with regard to relations of management and labor, Congress has long recognized that a number of problems peculiar to the railroad industry necessitate separate treatment of that industry in various aspects,* rather than subjecting it to other Federal legislation applicable to industries generally or leaving it subject to varied State laws, and to meet that necessity has enacted such legislation as the Railway Labor Act, the Employers' Liability Act and the Railroad Retirement Acts. For similar reasons, *the inclusion of the railroad industry under the various State unemployment insurance acts and titles III and IX of the Social Security Act results in needless inequalities and inequities to the employers and employees. Unemployment insurance for railroad workers is especially not susceptible of treatment by numerous State plans, since a large portion of railroad workers perform their services in more than one State and find it extremely difficult satisfactorily to adjust their rights under the somewhat varied State plans.* The employers also are confronted with the problem of keeping records and making reports under the divergent requirements of the State acts. The bill provides for a system of unemployment insurance designed to meet the peculiar needs of the industry, and in so doing avoids many of the intricacies and complexities of the existing State plans.

H.R.Rep. No. 2668, 75th Cong., 3d Sess. 1–2 (1938); S.Rep. No. 2164, 75th Cong., 3d Sess. 1–2 (1938) (emphasis added). Because Congress was specifically concerned about the problems arising from the interstate character of rail industry employment, it was logical and meaningful to adopt the ICA's definition.

Congress chose in the RRA and RUIA to paint neither as broadly as the Board argues nor as narrowly as ITEL urges. Congress chose, painting broadly, to cover all employees of rail carriers, whether or not they suffered the problems of interstate commerce. Congress foresaw and provided statutory tools to halt rail carriers who sought to undermine the Acts by creating subsidiaries who in fact exist only to serve their rail carrier parents and whose primary purpose is to remove workers from the Acts' coverage. *Southern Development* and *Despatch* vindicate this congressional foresight. The Board does not argue that ITEL's Rail Division exists primarily or even substantially to serve the rail carrier subsidiaries, or that ITEL's actions removed previously-covered workers from the Acts.

Congress also chose, painting narrowly, to limit RRA and RUIA to services covered by the ICA. The Board's decision is not consonant with this congressional choice. The chief drawback, then, of the Board's interpretation of the transportation clause is that it requires us to ignore clear statutory language and legislative history without any underlying justification for such action. Therefore, we must conclude that the Board's decision does not have a reasonable basis in law.

The decision of the Board is accordingly reversed.

ESCHBACH, Circuit Judge, dissenting.

The Railroad Retirement Board ("Board") found that ITEL Corporation's Rail Division provides a service in connection with the transportation of property by railroad. I cannot label this finding unreasonable; indeed, the Board's conclusion is entirely consistent with the governing statutes' language, history, and authoritative interpretations.[1]

I.

As the majority ably notes, an entity is an employer covered by the provisions of the Railroad Retirement Act and the Railroad Unemployment Insurance Act only if it "performs any service ... in connection with the transportation of ... property by railroad." *See* 45 U.S.C. §§ 231(a)(1), 351(a). ITEL Corporation's Rail Division, as the name implies, does perform such services. The Rail Division has 15,600 railroad cars, which are provided (leased) to rail carriers. The Rail Division monitors the movement of the cars, determines the amounts of fees owing to the Rail Division, and collects these fees. Moreover, the Rail Division is often responsible for the repair and maintenance of its cars.

I know of no way that a railroad could operate without railroad cars. Purchasing railroad cars, maintaining the cars, monitoring the cars' locations, and providing the cars for the transportation of shippers' goods, are activities typically performed by a railroad in connection with its transportation services. In this case a non-carrier is providing these services; however, this fact does not transform the services into services unconnected with the transportation of property by railroad. *See Southern Developmental Co. v. Railroad Retirement Board,* 243 F.2d 351, 355 (8th Cir.1957); *Railroad Retirement Board v. Duquesne Warehouse Co.,* 149 F.2d 507, 509 (D.C.Cir.1945), *aff'd,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946).

ITEL Corporation's Rail Division, therefore, provides a service that is vital to the transportation services of many rail carriers; if the Rail Division's property and services disappeared, the nation's rail transportation system would be significantly affected. The Railroad Retirement Act and the Railroad Unemployment Insurance Act apply to entities performing "services ... in connection with the transportation of ... property by railroad."[2] In light of the cannon of construction that the words of statutes are to be given their ordinary meaning, *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), I cannot term unreasonable the Board's conclusion that the Rail Division is governed by the two acts.

II.

I recognize that Congress may not always say what it means. The plain meaning of statutory language may be disregarded if there is a clearly expressed legislative intent that is contrary to the ordinary meaning of the words. In this case, however, I can discern no such legislative intent.

The drafters of the Railroad Retirement Act and the Railroad Unemployment Insurance Act derived the phrase "in connection

---

1. Because the majority does not consider whether the Rail Division is "under common control" with a rail carrier, I also will not reach that issue.

2. The entity also must have a sufficient affiliation with a railroad. I do not reach the question whether such an affiliation exists in this case. *See supra* note 1.

with the transportation of ... property by railroad" indirectly from the definition of "transportation" contained in § 1 of the Interstate Commerce Act, 41 Stat. 474, 475 (1920). The majority's argument is premised on this fact and the fact that the leasing of railroad cars to a carrier is not an activity regulated under the Interstate Commerce Act. Because the Rail Division's leasing activities are not regulated by the Interstate Commerce Act, the majority concludes that the Rail Division is not governed by the Railroad Retirement and Railroad Unemployment Insurance Acts.

The implicit, and false, premise in the majority's argument is that the Rail Division's leasing activities are not regulated under the Interstate Commerce Act because the leasing of cars is not a transportation service as defined in § 1 of the Interstate Commerce Act (now codified as amended at 49 U.S.C. 10102(24)). In fact, the reason that the Rail Division's leasing activities are not regulated by the Interstate Commerce Commission is that the Rail Division is not a carrier and "the only relation that is subject to the Commission is that between the railroads and the shippers." *Ellis v. ICC,* 237 U.S. 434, 444, 35 S.Ct. 645, 646, 59 L.Ed. 1036 (1915). A lessor of railroad cars is not a carrier engaged in a public service; as such the lessor's practices lie outside of "the realm of the Commission's competence." *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 429, 60 S.Ct. 325, 329, 84 L.Ed. 361 (1940). In fact I read *Ellis* and *General American Tank Car Corp.,* the two cases on which the majority relies, as finding that the leasing of railroad cars is contained within the definition of transportation in § 1 of the Interstate Commerce Act. *See Ellis,* 237 U.S. at 443, 35 S.Ct. at 646 ("the definition of transportation includes such instrumentalities as the Armour Car Lines lets to the railroads"); *General American Tank Car Corp.,* 308 U.S. at 428, 60 S.Ct. at 329 ("Freight cars are facilities of transportation, as defined by the Act.").

The case law confirms my view that the scope of entities brought under the purview of the Railroad Retirement and Railroad Unemployment Insurance Acts is not coextensive with the entities subject to regulation under the Interstate Commerce Act. In *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946), a warehouse company that handled and stored goods being shipped by a railroad, was found to be an employer covered by the Railroad Retirement and Railroad Unemployment Insurance Acts even though the company was not regulated under the Interstate Commerce Act. *See id.* at 454, 66 S.Ct. at 241; *accord Southern Development Co. v. Railroad Retirement Board,* 243 F.2d 351 (8th Cir.1957); *Despatch Shops, Inc. v. Railroad Retirement Board,* 153 F.2d 644 (D.C.Cir. 1946). If any more support for my view is needed, it can be found in the words of the person in charge of the Retirement Bill in the Senate, Senator Wagner, who stated that the Railroad Retirement Act's coverage would include "not only those directly in the railroad business but those *associated with it.*" 81 Cong.Rec. 6223 (1937) (emphasis added).

### III.

My initial reaction to this case was that ITEL Corporation's Rail Division, which forms a vital part of our nation's rail system, obviously performs services in connection with the transportation of property by rail. Nothing in the legislative histories of the Railroad Retirement and Railroad Unemployment Insurance Act has convinced me that my initial reaction was wrong.