**STANDARD OFFICE BUILDING CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 81 C 6158.

United States District Court, N.D. Illinois, E.D.

June 11, 1986.

Brian J. McKenna, Alan E. Bain, Daniel J. Westerbeck, Orval M. Adam, Chicago, Ill., for plaintiff.

Michael O'Connell, Asst. U.S. Atty., Chicago, Ill., Terri E. Schapiro, Michael J. Weitzner, Trial Attys., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

GRADY, Chief Judge.

This tax refund case involves difficult questions pertaining to the interpretation of two sections of the tax code, 26 U.S.C. §§ 3231(a) and 6051(a) and (c). The case is before us on the parties' cross-motions for summary judgment as to the liability of the plaintiff taxpayer, Standard Office Corporation ("Standard"), for assessments made by the government against it pursuant to the Railroad Retirement Tax Act, 26 U.S.C. § 3201 *et. seq.* ("RRTA"). For the reasons given below, Standard's motion is denied, and the government's motion is granted.

**FACTS**

The parties have stipulated to the facts of this case. Standard is an Illinois corporation. During the period 1972 through 1980 (the period upon which the disputed assessments are based), the 100 percent shareholder of Standard was Santa Fe Industries, Inc. ("Santa Fe"), a parent holding company. Santa Fe was also the 100 percent sole shareholder of The Atchison,

Topeka and Santa Fe Railway Co. ("Atchison"), which is the rail carrier within the meaning of 26 U.S.C. § 3231(g).

Standard was first incorporated in 1902. There were eleven original shareholders, including a nominee of Atchison, who owned 11.1 percent of the stock. Subsequently, Atchison gradually acquired a greater percentage of Standard's stock, until, in 1955, Atchison became Standard's sole shareholder. In 1970, Atchison distributed Standard's stock to Santa Fe.

The only business in which Standard has ever engaged was the ownership, operation and leasing of a commercial office building at 224 South Michigan Avenue, Chicago. There were three tiers to Standard's organizational structure: corporate officers and directors; the building manager and his secretary; and the building superintendent and union employees. The corporate officers and directors were all employed by either Santa Fe or Atchison; they were paid by Santa Fe or Atchison, and they devoted a relatively small amount of time to Standard. The building manager and his secretary were employed by Scribner & Co. ("Scribner"), an independent real estate management firm. Scribner managed the building in return for a percentage of the gross rental income collected from the building tenants. The building manager basically ran the building—obtained tenants, negotiated leases, collected rents and supervised building maintenance. Finally, a building superintendent and 64 union employees were employed by Standard to maintain the building. The building manager hired and fired these employees; Standard paid them.

During 1972 to 1980, the building was leased, on average, to about 75 different tenants. The largest tenant was Atchison. In 1904, it occupied 11 percent of the building; in 1952, it occupied 41 percent of the building, and since that time, its occupancy has fluctuated around 50 percent of the building. The rent it paid was basically commensurate with the space it occupied: its rent represented 47 percent of the rent income received by Standard from 1972 to 1980. Any decision to increase the rent charged to Atchison was made by Standard's officers and directors.

## DISCUSSION

Standard paid Federal Income Contributions Act ("FICA") tax, and filed FICA tax returns (Form 941) for its employees from 1972 through 1980. The government contends that Standard should have been filing RRTA Form CT-1 returns and paying RRTA tax, which is higher than FICA tax.

Standard raises two arguments in support of its position that it need not pay the government's RRTA tax assessments: (1) it was not an "employer" within the meaning of 29 U.S.C. § 3231(a), and (2) the assessments were untimely.

### "Employer" Under § 3231(a)

An employer must pay RRTA taxes if it fits into the definition given in § 3231(a). Under § 3231(a), the term employer means "any carrier" or "any company which is directly owned or controlled" by a carrier "or under common control therewith," and which "operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad...."

The parties agree that Standard is not a carrier, but is under common control with one (Atchison). Therefore, the issue here is whether Standard's activities in owning, leasing and maintaining the building in which Atchison rents space is a "service in connection with ... transportation." Additionally, Standard argues that if it does provide such a service, the service meets § 3231(a)'s exception for casual service or casual operation.

There are three cases which affect our decision: *Itel Corp. v. United Railroad Retirement Board,* 710 F.2d 1243 (7th Cir. 1983); *Southern Development Co. v. Railroad Retirement Board,* 243 F.2d 351 (8th Cir.1957); and *Despatch Shops v. Railroad*

*Retirement Board,* 153 F.2d 644 (D.C.Cir. 1946). In *Despatch,* the taxpayer, a wholly-owned subsidiary of a rail carrier, operated a railroad freight car shop, and argued that it was not an employer under the Railroad Unemployment Insurance Act, 45 U.S.C. § 351(a) ("RUIA"), and the Railroad Retirement Act, 45 U.S.C. § 231(a)(1) ("RRA").[1] The car shop built and repaired freight cars, and the vast bulk of work was done on behalf of its carrier:

> It does not appear that Despatch was a competitor with other car builders in the usual sense of the word. While it did small amounts of work for others [carriers], no effort was made to solicit business or extend its operation to serve other lines.

*Despatch,* 153 F.2d at 694.

Based on these facts, the court concluded that "the primary function" of the subsidiary was to serve its carrier. The court then looked at the type of service the subsidiary provided and found that it was "inherent or vital to the sustained functioning of a railroad system." *Id.* at 646. Based on these two conclusions, the court affirmed the Railroad Retirement Board's ruling that the subsidiary was an employer under the Acts, because the opposite determination would allow railroads to avoid the Acts by setting up subsidiaries to provide "supporting" rail activities:

> If Despatch, in this situation, is not an "employer" under the terms of the Act, it can be readily seen that the railroads would be free to take from under the Act virtually all of their workers whose employment is in the "supporting" activities, through the simple expedient of setting up wholly owned corporate affiliates to perform these services. It is conceivable that everything from maintenance-of-way through engineering or bookkeeping might be done by so called "independent" corporations. The application of this Act and of the other Acts passed for similar purposes and embodying the same language could be so severely limited to render them of little worth in achieving the purposes for which they were passed. *Id.*

In *Southern Development,* a rail carrier established a wholly-owned subsidiary to operate and maintain the office building in which the carrier rented approximately 64 percent of the building's total rental space. Originally, the carrier had rented space in the building from a corporation unaffiliated with the carrier. During the period it rented from the unaffiliated corporation, the carrier was responsible for cleaning its rented space, and the carrier used six carrier employees, covered by the RRA and RUIA. After the carrier bought the building from the unaffiliated corporation, its subsidiary engaged seventeen workers to clean the entire building, including the six former carrier employees. After the six employees went to work for the subsidiary, the subsidiary discontinued the benefits under the RRA and RUIA which they formerly enjoyed as carrier employees. *Southern Development,* 243 F.2d at 354–55 n. 1.

The court found that the statutory language "services in connection with ... transportation" meant not only transportation itself, but also activities in support of such transportation. *Id.* at 354. To support this view, it cited *Despatch's* statement cited *supra:* if an employer could farm out "supporting activities," this would undermine the Acts. The court then concluded that maintaining a building "almost exclusively" for use by a railroad carrier for ticketselling and office space was supportive of rail transportation, and, therefore, the subsidiary was an employer for the purposes of the Acts. Additionally, the court found that such maintenance service was not a "casual service" excepted under the Acts. *Id.* at 355.

Finally, in *Itel,* the taxpayer's rail division purchased and leased rail cars. The parent company then acquired four railroads. Twelve percent of the rail division's

---

**1.** The RUIA and RRA's definitions of employer are nearly identical to the RRTA's, and we may look to RUIA and RRA cases for guidance. *See Railway Labor Executives Association v. United States Railroad Retirement Board,* 749 F.2d 856, 863 n. 2 (D.C.Cir.1984).

cars were leased to these subsidiary railroads, and less than five percent of the rail division employees were involved in transactions with the subsidiary railroads. After the parent acquired the railroads, the rail division did not perform any transportation service for the railroad subsidiaries that the railroads had previously provided for themselves. *Itel,* 710 F.2d at 1244.

The court reversed the Railroad Retirement Board's ruling that the rail division was an employer within the meaning of the RRA and RUIA. First, the court found that "services in connection with ... transportation" means only services that are covered by the Interstate Commerce Act, 49 U.S.C. §§ 10101 *et. seq.* ("ICA"). *Id.* at 1245, citing *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946). The court then found that the rail division's activities were not covered by the ICA, and, therefore, the division was not an employer within the meaning of the Acts.

The court noted that the taxpayers' activities in *Southern Development* and *Despatch* were also "services not embraced by the ICA," but distinguished them as presenting exceptional situations. The court stated:

> In *Southern Development* ... a rail carrier established a wholly-owned subsidiary to operate and maintain the railroad's office building. The employees of the subsidiary were originally employees of the railroad, and, by virtue of the railroad's actions, the railroad sought to deprive these employees of their RRA and RUIA benefits.... There was no question that the railroad's actions intentionally undermined the Acts.... Similarly, in *Despatch Shops* ... a wholly-owned subsidiary which performed repair and construction of rolling stock and whose primary function was to service its railroad parent was found to be an employer under RUIA and RRA.

*Itel,* 710 F.2d at 1247. The court then cited *Despatch's* conclusion that if the subsidiary were not treated as an employer, carriers could farm out "supporting activities" and

undermine the Acts. *Id. See supra* at 551–52.

In distinguishing the rail division's situation in *Itel,* the court stated:

> The Rail Division's primary function is not to serve ITEL's rail carrier subsidiaries. Only eleven percent of the Rail Division's business is with the subsidiaries. The Rail Division did not attempt to subvert the Acts by removing workers formerly covered by the Acts. Rail Division employees were not covered by the Acts prior to ITEL's acquisition of the railroad subsidiaries. Since acquisition, the Rail Division performs no services for the railroads which they previously performed for themselves. As such, the *Southern Development* and *Despatch* justifications for extension of the transportation clause are absent.

*Itel,* 710 F.2d at 1247–48. The court then summarized its holding:

> Congress chose, painting broadly, to cover all employees of rail carriers, whether or not they suffered the problems of interstate commerce. Congress foresaw and provided statutory tools to halt rail carriers who sought to undermine the Acts by creating subsidiaries who in fact exist only to serve their rail carrier parents and whose primary purpose is to remove workers from the Acts' coverage. *Southern Development* and *Despatch* vindicate this congressional foresight. The Board does not argue that ITEL's Rail Division exists primarily or even substantially to serve the rail carrier subsidiaries, or that ITEL's actions removed previously-covered workers from the Acts.

*Itel,* 710 F.2d at 1248.

■ We read *Itel* as holding that in order for an employer to be covered by the RRA or RUIA (and therefore, the RRTA, see note 1), the employer's services must be covered by the ICA—unless the employer exists "only to serve [its] rail carrier parent[ ]," or when its "primary function" is to serve the carrier. *See also Railroad Concrete Crosstie Corp. v. Railroad Retirement Board,* 709 F.2d 1404, 1411 (11th

Cir.1983) (subsidiary constitutes RRA and RUIA employer when "economically dependent" on parent carrier). The question here is whether in *Itel* the court was indicating that a subsidiary that maintains an office building in which its affiliated carrier rents a substantial amount of space is generally existing only to serve its affiliated carrier, or whether such a subsidiary comes within the Acts only when it hires workers formerly employed by the carrier.

We have quoted *Itel* extensively in order to demonstrate that it does not spell out the answer to this question clearly. The Seventh Circuit found the subsidiary in *Southern Development* an employer within the Acts because its employees were formerly employed by a carrier. It found the subsidiary in *Despatch* an employer because its "primary function was to serve its railroad parent." *Itel,* 710 F.2d at 1247. Standard argues that the government agrees that Standard's employees were not formerly employed by Atchison, so that *Southern Development* is not applicable. It further claims that by owning and maintaining the building in which Atchison rents approximately half the space, Standard is not existing "only to serve" Atchison.

Because *Itel* is ambiguous on this point, we find this a close question. The government argues that maintaining a building is a transportation service covered by the ICA. But the court in *Itel* clearly found such a service not to be within the ICA, because it discussed *Southern Development* as an extension, not a case fitting the general rule. *Itel,* 710 F.2d at 1247. The court in *Itel* also seems to have rejected the position that transportation services include supporting activities, which is the view upon which *Southern Development* relied in making its determination. Yet the court in *Itel* did cite Despatch's discussion that a carrier should not be permitted to farm out supporting activities to avoid the Acts. Therefore, while the court in *Itel* states that it is rejecting *Southern Development's* definition of a transportation service, by embracing *Despatch's* view that "primary function" activities must be in-

cluded in order to avoid undermining the Acts, the court appears to be including with its extension most "supporting activities" included under *Despatch's* test.

Under either a "supporting activity" or "primary function" test, it is debatable whether Standard's operation of the building constitutes a "service in connection with ... transportation" under § 3231(a). Approximately half the building provides space to rail carrier employees, and operation of this space is clearly a "supporting activity," because the carrier could not carry out the functions involved without space to house its employees. Similarly, it is clear that the "primary function" of Standard's maintenance of the space rented to Atchison is to serve the rail carrier's needs.

On the other hand, the other half of the building's space is rented out to non-carrier tenants. The rental income generated by Standard's operation of this space does not inure to Atchison's benefit. Therefore, if we looked at the operation of this half of the building's space separately from operation of the half rented by Atchison, it would be difficult to argue that the position that the primary function of the operation of this half of the building's space is to serve Atchison.

But we cannot look at the operation of this half of the space separately from the half rented by Atchison, because the tax at issue is based on the wages of employees who work throughout the entire building. Standard operates the building as one cohesive unit. Therefore, we must ask whether the "primary function" of the building as a whole is to serve Atchison.

■ While we believe that we could reasonably decide this issue either way, we find that the "primary function" of Standard's operation of the building is to serve Atchison. Atchison needs a large amount of space to house its employees. It chose to procure that space by renting from an affiliated corporation. Over time, Atchison has been able to satisfy its fluctuating needs for space through rental from Stan-

dard—Standard has complied with Atchison's changing demands for space. Also, because Standard's officers and directors are all employed and paid by Atchison or Santa Fe, and these directors determine the rental rate charged to Atchison, Atchison knows that it at least has a sympathetic landlord unlikely to impose an unreasonable rate. Therefore, Atchison has procured the advantage of some security in retention of acceptable rental conditions from its affiliation with Standard that it may not have been able to obtain from a non-affiliated landlord. In light of the sizable portion of the building rented by Atchison and the inherent advantages a tenant has when it is affiliated with its landlord, we conclude that Atchison became Standard's sole shareholder (subsequently distributing the stock to Santa Fe) in order to protect its interest in procurement of sufficient, reasonably affordable space for its carrier employees. Standard has adhered to a policy which fulfills this interest. Therefore, we find that Standard's generation of rental income is a goal secondary to the primary service of fulfilling Atchison's interest, and, therefore, *Itel's* "primary function" test is met, and Standard must pay RRTA taxes. To find otherwise, would be to encourage the farming-out conduct condemned in *Despatch, Southern Development* and *Itel.*

We also find that Standard's activities were not "casual services" for the reasons stated in *Southern Development,* 243 F.2d at 355. Therefore, Standard is an employer within the meaning of the RRTA.

## Statute of Limitations

Generally, the government must assess a tax within three years after a taxpayer has filed its return. 26 U.S.C. § 6501(a). An exception is made if the taxpayer files no return, in which case, the tax may be assessed at any time. 26 U.S.C. § 6501(c). The definition of a return for the purposes of this statute of limitations is not provided in the tax code.

Standard argues that its FICA Form 941 returns, which it filed quarterly, constituted returns triggering § 6501(a)'s three year statute of limitations for assessment of RRTA taxes. Therefore, they argue, the limitations periods for assessing taxes based on the taxable periods between January 1, 1972, and December 31, 1978, expired before the government made its tax assessments in this case.[2] In response, the government argues that the Form 941 returns do not constitute returns for the purposes of triggering § 6501(a)'s three-year period, and, therefore, § 6501(c) applies, making its assessments timely.

We have already denied Standard summary judgment on this point, finding that the statute of limitations did not begin to run when Standard filed its Form 941 returns, because the forms did not disclose "all of the data from which Plaintiff's RRTA tax liability could have been computed." Order of September 15, 1983, at 1. Specifically, we noted that the forms, while disclosing certain numerical information, did not disclose that Standard was under common control with a railroad carrier. Therefore, we concluded that there was no way the government could have ascertained potential RRTA tax liability from the forms. *Id.* at 1–2. We did not cite any case authority in our order, but the test cited, that the forms contain "all of the data from which the [later assessed] tax … can be computed," is found in *Germantown Trust Co. v. Commissioner,* 309 U.S.

---

**2.** The government assessed RRTA taxes against Standard for taxable periods ending in 1972 through 1974 on September 23, 1981; it assessed taxes for the periods ending in 1975 through 1980 on February 25, 1983. Stipulation ¶¶ 7, 8. While Standard stated in its stipulation of facts that the government's assessment as to 1979 RRTA taxes was untimely, *see* Stipulation ¶ 17 and Amended Complaint, Count II, the government argues that assessments for the 1979 taxable periods met § 6501(a)'s three-year limitation period, because the 1979 Form 941 returns were not deemed filed until April 15, 1980. *See* 26 U.S.C. § 6501(b)(2). Standard appears to concede this point. *See* Motion for Summary Judgment at 21, n. 18; Memorandum in Reply to United States' Cross-Motion for Summary Judgment on the Issue of Liability at 15.

304, 309, 60 S.Ct. 566, 568, 84 L.Ed. 770 (1940).

Recently, Judge Bua also held that the filing of a Form 941 return does not trigger the limitations period for assessing an RRTA tax. *Santa Fe Land Improvement v. United States*, No. 83 C 5713, Order (N.D.Ill. April 22, 1986) (Bua, J.). Judge Bua applied the test for a triggering return found in *Commissioner v. Lane-Wells Co.*, 321 U.S. 219, 223, 64 S.Ct. 511, 513, 88 L.Ed. 684 (1944): the form filed must "show the facts on which liability would be predicated."

In asking us to reconsider our decision, Standard argues that *Germantown* and *Lane-Wells* contain separate and different tests; that the test found in *Germantown* and not *Lane-Wells* should be applied here; and that under a correct application of the *Germantown* test, its Form 941 returns constitute returns for the purposes of § 6501(a).[3]

Upon further reflection, we agree with Standard that *Lane-Wells* could perhaps be adding a gloss to the test found in *Germantown*, but we adhere to our previous decision, because if *Lane-Wells* does add a gloss, that gloss applies in the instant case. Like the issue previously discussed (the definition of an employer for RRTA purposes), this determination involves a difficult inquiry, because the case law is not clear.

In *Germantown*, a trust company filed a Treasury Form 1041 return, intended for use by trustees. A Treasury Form 1041 return was basically an "informational" return; that is, it was not designed to enable a computation of tax liability against the filer, but rather to inform the government that persons other than the filer (the trust beneficiaries) were liable for taxes: the trust company as a trustee was not liable for tax on trust income. *See Durovic v. Commissioner*, 487 F.2d 36, 50 n. 2 (7th

Cir.1973) (Swygert, J., dissenting). More than two years after the trust company filed its return, the government determined that the company should have been taxed as a corporation.[4] The Supreme Court found the government's action untimely, holding that the company had filed a return for the purposes of § 6501(a) (then § 275(a)), and that § 6501(c) (§ 275(c)) was inapplicable. *Germantown*, 309 U.S. at 309, 60 S.Ct. at 568. The Court stated:

> The respondent's contention is that where a fiduciary, in good faith, makes what it deems the appropriate return, which discloses all the data from which the tax, treated as one imposed upon an association (classified as a corporation under the statute), can be computed, such a return is to be deemed no return. We think this view inadmissible.
>
> It cannot be said that the petitioner, whether treated as a corporation or not, made no return of the tax imposed by the statute. Its return may have been incomplete in that it failed to compute a tax, but this defect falls short of rendering it no return whatever.

*Id.* at 309–310, 60 S.Ct. at 568–569.

In *Lane-Wells*, a company filed a corporate return (Treasury Form 1120). It did not file a separate return on Form 1120H for personal holding companies, and answered "no" to a question on Form 1120 which asked whether it was a personal holding company. More than three years after the Form 1120 was filed, the government assessed a personal holding company tax against the company. This personal holding company tax was a tax supplemental to the corporate tax: corporations which were also personal holding companies had to pay both taxes. *Lane-Wells*, 321 U.S. at 221–222, 64 S.Ct. at 512. The company argued that under *Germantown*, its Form 1120 return met the requirements for an 1120H return, because it contained "all the facts necessary" for the govern-

---

**3.** Standard also notes that we based our previous decision partly on a contested issue of whether Standard had filed the Form 941 returns in good faith. The government has since stipulated that the forms were filed in good faith. Stipulation ¶ 74.

**4.** The statute of limitations at that time was two, not three years.

ment "to compute the taxes as a personal holding obligation." *Id.* at 223, 64 S.Ct. at 513. The Court held that this was not enough, because the returns "did not show the facts on which liability would be predicated." *Id.* Since the whole purpose of requiring a second form to be filed was to "obtain data on which corporations subject to the [personal holding company] tax could be identified and assessed," the Form 1120 did not trigger the limitations period. *Id.* The court further stated that the purpose of the tax laws is taxpayer "self-assessment:"

> Congress has given discretion to the Commissioner to prescribe by regulation forms of return and has made it the duty of the taxpayer to comply. It thus implements the system of self-assessment which is so largely the basis of our American scheme of income taxation. The purpose is not alone to get tax information in some form but also to get it with such uniformity, completeness, and arrangement that the physical task of handling and verifying returns may be readily accomplished. For such purposes the regulation requiring two separate returns for these taxes was a reasonable and valid one and the finding of the Board of Tax Appeals that the taxpayer is in default is correct.

*Lane-Wells,* 321 U.S. at 223–224, 64 S.Ct. at 513.

The holding in *Lane-Wells* can be interpreted at least three different ways. The Court could have meant that the fact that the corporation was also a personal holding company was a piece of datum needed to compute its personal holding company tax, and, therefore, the statement in *Lane-Wells* that a company must include "all the facts on which liability would be predicated," is merely another way of stating *Germantown's* "all the data from which the tax ... can be computed." The piece of information omitted in *Lane-Wells* was that the corporation was a personal holding company. We cannot discern from our reading of *Germantown* whether a similar piece of information, the trustee's status as a corporation, was also omitted from the

trustee's Form 1041. If not, then the *Lane-Wells* test is merely a rephrasing of the *Germantown* test, and under both tests, identifying information, such as a taxpayer's status as a corporation or holding company, is part of the data required to be included in the return in order to trigger § 6501(a).

If the trustee's Form 1041 in *Germantown* did not include this information, then *Lane-Wells* could be adding a gloss to the *Germantown* test: not only must a taxpayer include all the pertinent numerical information as to its income, it must also list all other facts, such as its status, needed by the government to determine which and what amount of taxes it must pay. The Court in *Lane-Wells'* discussion of a taxpayer's duty to "self-assess" and arrange included information supports this second interpretation, because the discussion seems to recognize a new interest in the examination of a return. In *Germantown,* the Court appeared to view the return from the perspective of the taxpayer's interest in having the limitation period begin when he files a return—any kind of return—in good faith. In *Lane-Wells,* the Court seems to view the return from the government's perspective, and focuses on its interest in having all the information necessary to determine not only whether the computations based on the income data contained in the form are correct, but also whether the correct form has been filed, and the correct tax rate is being applied.

Finally, the Court in *Lane-Wells* could be distinguishing *Germantown* based on the fact that only one form had to be filed in *Germantown,* while two were required in *Lane-Wells.* The reasoning behind this distinction could be that tax regulations specifically gave the government an entitlement to two distinct returns from personal holding companies. *See Lane-Wells,* 321 U.S. at 223, 64 S.Ct. at 513. The question then arises whether the government's entitlement to information as to the taxpayer's status (as opposed to his income) is limited to situations in which two separate returns are required.

Unfortunately, case law subsequent to *Lane-Wells* has not illuminated its meaning. Justice Stevens has stated that the Supreme Court has merely required that "if a return constitutes an honest and genuine attempt to satisfy the law, it is sufficient to commence the running of the statute of limitations," citing both *Lane-Wells* and *Germantown*. *Badaracco v. Commissioner*, 464 U.S. 386, 402–03, 104 S.Ct. 756, 766, 78 L.Ed.2d 549 (1984) (Stevens, J., dissenting). This interpretation seems to dispense with the requirement that certain facts or data be included, except as evidence of good faith.

In *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957), the Court held that a Form 990 return filed in compliance with 26 U.S.C. § 54(f) was not a return for the purposes of § 6501(a) (§ 275(a)), because a Form 990 return is merely informational, filed by tax-exempt corporations to help Congress determine whether legislation should be enacted to subject them to taxation when they compete with taxable corporations. Because such returns "lack the data necessary for the computation and assessment of deficiencies," citing *Lane-Wells*, the Court found a failure to meet § 6501(a)'s requirements. *Automobile Club*, 353 U.S. at 188, 77 S.Ct. at 712. This case is of no aid, because apparently a Form 990 return would not meet either *Lane-Wells'* or *Germantown's* tests (assuming a distinction between the tests).

The Seventh Circuit discussed *Lane-Wells* and *Germantown* in *Durovic*. There, a partnership filed an informational return, and the taxpayer partner filed no return. The partnership return contained a list of practically all the partner's gross income. The court held that the partnership's return did not trigger § 6501(a)'s three-year period for the individual return because, applying *Lane-Wells*, the filing of

one return does not trigger the period for filing a second return, even though full disclosure of gross income, deductions and resulting net income is included in the first return. *Durovic*, 487 F.2d at 40. The court cited the "self-assessment" discussion in *Lane-Wells*, and concluded that the government was not barred from suit. *Id.* This opinion does not explain what type of information is required when the taxpayer is required to file only one return and files the wrong one.

In a lengthy dissent, Judge Swygert interpreted *Lane-Wells* as hinging not on the fact that two returns were filed, but rather on the necessity of including all the facts needed to determine liability. *Id.* at 52. Since the partnership return included the information that the taxpayer was a partner, and the amount of his income, Judge Swygert believed that the return met *Lane-Wells* test. He read the majority opinion as holding that even if all this information (taxpayer income and status) is included in one return, the return does not meet § 6501(a) if two separate returns are required, because of the need for taxpayer "self-assessment." *Id.*

Here, Standard failed to indicate in its Form 941 returns that it was affiliated with a railroad carrier.[5] It also failed to state its employees' wages on a monthly basis (as the RRTA form requires), but rather, presented the wages in a yearly format (as FICA requires). Other minor differences between the numerical data required in the two different types of forms were also reflected in Standard's returns. *See* Memorandum for Defendant in Opposition to Plaintiff's Motion for Summary Judgment at 9–11.

Standard argues that its return met the *Germantown* test, because if one used the data contained in its Form 941 returns, one could compute a figure for RRTA tax "fairly close" to the actual figure the govern-

---

5. Standard filed Form 1120 corporate returns which indicated Standard's affiliation with Atchison, but Standard's Form 941 returns did not contain this information. We believe that under *Durovic*, the taxpayer itself, and not its partnership or parent, must reveal all the required information. Therefore, if *Germantown* requires information as to taxpayer affiliation, or if *Lane-Wells* provides a different test and that test applies to Standard's return, the government's assessments are timely. *See supra* at 558.

ment claims should have been paid. Stipulation ¶ 79. It argues that the *Lane-Wells* test should not be applied, because that test is used only when two separate taxes and two separate returns are required: under *Germantown,* taxpayer status need not be reported, and *Germantown* applies to one return situations.

First, all the numerical data needed to compute the RRTA tax are not contained in Standard's Form 941 returns, because the monthly wages of Standard's employees are not provided. Therefore, it is at least arguable that Standard's returns fail the *Germantown* test. However, because the monthly wages here appear to be merely the annual wages divided into twelve increments, one could contend that the data were included, but merely not arranged in the proper format. Also, under Judge Swygert's reading of *Germantown,* such minor omissions would not prevent the limitations period from running. *See Durovic,* 487 F.2d at 50 n. 2 (Swygert, J., dissenting).

 More fundamentally, we believe that Standard's affiliation with Atchison either had to be reported under the *Germantown* test, or, if not, under the *Lane-Wells* test, which applies here. In short, we agree with that part of Judge Swygert's dissent in *Durovic* which interprets *Lane-Wells* as requiring that a return provide all the facts, not just numerical data, which the government needs to determine tax liability, even in one return situations.

We realize that from Standard's point of view, this result may appear harsh: it filed FICA tax returns which it believed in good faith met its tax obligations. But the taxpayer's interest is not paramount in determining whether the limitations period began to run. A limitations period should afford full opportunity to sue before the bar takes effect; therefore, a tax return which does not disclose information needed by the government to determine whether a different tax should be paid should not start the limitations period running. *See Dubuque Packing Co. v. United States,* 126 F.Supp. 796, 798 (N.D.Iowa 1954), *aff'd,* 233 F.2d 453 (8th Cir.1956). *See also*

*Santa Fe Trail Transportation Co. v. United States,* Civ. No. 82–1221, Memorandum and Order (D.Kan. Aug. 18, 1983). *Lane-Wells'* discussion of the taxpayer's duty to "self-assess" underscores this governmental interest.

■ Therefore, we adhere to our earlier position and agree with Judge Bua that a Form 941 return does not trigger the statute of limitations for assessing an RRTA tax.

## CONCLUSION

Standard's motion for summary judgment is denied. The government's motion for summary judgment is granted. A status hearing is set for July 1, 1986, at 9:45 a.m.